DICKEY, TANSLEY & CO., AND THE SECOND NATIONAL BANK OF BALTIMORE vs. POCO-MOKE CITY NATIONAL BANK AND FRANKLIN G. LEWIS.

*Appeal—Pledge of Single Bill Secured by Mortgage—Pledge of Policies of Fire Insurance—Pledge of Choses in Action Without Written Assignment—Priority Between Assignments—Notes Secured by Mortgage—Subrogation of Surety to Creditor's Rights Against Principal—Presumptions as to Foreign Law—Judicial Notice—Costs.*

No appeal lies from an order dismissing a petition for leave to take additional testimony and for a re-hearing, filed after a determination of the case.

When the pledgee in a single bill endorses the same in blank, but not under seal, and transfers it as collateral security for the payment of the debt, the holder is authorized to fill up the blank with an assignment to himself and has complete title against the maker of the single bill, although the assignor is not liable thereon, because the assignment is not under seal, according to Code, Art. 8, sec. 9.

The Act of 1892, ch. 392, providing that after the maturity of a note secured by mortgage the title to the same shall be conclusively presumed to be vested in the person holding the record title to the mortgage, applies only to mortgages recorded in this State, and there is no presumption that a similar statute exists in another State.

When a mortgagee assigns one of three notes or single bills secured by one mortgage, and delivers the other two, although not endorsed, to the assignee as collateral, that is of itself evidence of the mortgagee's intention to give the assignee of the one bill priority over the others if the fund derived from the mortgaged property prove to be insnfficient to pay them all in full.

The pledge of policies of fire insurance without a written assignment gives an equitable title to the pledgee, and the assent of the under-

writers is not requisite thereto although required by the policies in the event of assignment.

A pledge of a *chose in action* for the payment of money is not terminated by its delivery to the pledgor for the purpose of collecting the amount due under it and paying the same over to the pledgee.

A surety on a note for which property has been pledged, who pays part of the debt, is entitled to be subrogated to the rights of the pledgee against the pledge to the extent of his payments when such property is sold and the proceeds are in Court for distribution.

The delivery of a single bill secured by mortgage to the pledgee as collateral for a loan constitutes a valid pledge without a written assignment.

There is no presumption that the statute law of another State or of the District of Columbia is the same as the statute law of this State, when the statute has changed the common law.

The Court takes judicial notice of Acts of Congress of a public character such as those relating to the transfer of interests in vessels.

When a suit is instituted to recover property, upon which different parties have liens and the proceeds are not sufficient to pay all the claims in full, the person entitled to the first lien must contribute in proportion to the payment of the costs of the suit, and the same should not be cast altogether upon subsequent lienors.

L., as the mortgagee of a vessel, held three single bills secured by the mortgage, payable at different times, and certain policies of fire insurance, on the vessel. He borrowed a sum of money from a bank, pledging with it as collateral security the single bills and the policies, but only the first single bill, which amounted to more than the loan, was endorsed by him in blank. This was not paid when due and soon afterwards the vessel was destroyed by fire. The bank gave the policies of insurance to the mortgagee in order that he might collect the same and pay its claim thereout. L delivered the policies to an agent and trustee with power to collect the same and also executed to him an assignment of his interest in the mortgage with direction to pay from the proceeds of the policies the claim of the agent for services and certain other claims, including those of the appellants, which accrued after the loss. The amount collected on the policies was not sufficient to pay all the claims in full. Upon a bill of interpleader, *Held,*

1st. That the claim of the bank as pledgee of the single bills and policies of insurance is entitled to priority of payment over the claims directed to be paid by the subsequent assignment to the agent and trustee, since it was the intention of the parties to assign as collateral the whole of the indebtedness secured by the mortgage.

2nd. That the Act of 1892, ch. 392, providing that after maturity of notes secured by mortgage the title thereto shall be conclusively

presumed to be vested in the person holding the record title to the mortgage, is not applicable in this case since the mortgage was of a vessel situated in the District of Columbia and was there recorded.

3rd. That the bank secured a valid equitable interest in the policies of insurance by the delivery and parol assignment thereof either before or after the loss.

4th. That the delivery of the policies after the loss to L., the mortgagee, for the purpose of collecting them, did not terminate the pledge.

5th. That the subsequent attempt of L. to give to the appellants interests in the policies does not affect the claim of the bank, since the appellants have no claim to the proceeds of the policies except through L's. assignment to the trustee, who had full knowledge of the facts, and the appellants were not misled into giving credit to L. by the action of the bank ; some of the appellants becoming creditors of L. without having seen the policies, and if they had seen them they would have learnt that L's. interest was as mortgagee and would have had notice that the mortgage was given to secure the payment of three single bills not in L's. possession.

6th. That the compensation to the agent and trustee for collecting the policies should be paid proportionately by all the parties entitled to the fund.

7th. That the costs should also be paid by the parties in proportion to the amount they would receive were it not for such costs and the preferred claim of the agent and trustee.

Two appeals from the Circuit Court of Baltimore City (WICKES, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE and SCHMUCKER, JJ.

*Beverly W. Mister* (with whom was *Frederick W. Story* on the brief ), for Dickey *et al.*, appellants.

1. The legal title to the insurance money became vested in DuVal by the assignment of October 18th, 1895, by which he was authorized to collect the insurance money and apply it to the payment of the appellants' claim in conformity with the agreement with C. R. Lewis. Even if the agreement did not accomplish this, yet the legal title was drawn to them by the notice given to the insurance companies, December 2nd, 1895. This was all that could be

accomplished, as the suits had been brought in the name of C. R. Lewis.    Reasonable diligence in giving notice is required of all claimants to *choses in action* in order to protect their rights as against subsequent creditors for value. *Pomeroy Eq. Jur.*, sections 693, 695, 696, 698 ; *Dearle* v. *Hall*, 3 Russ. Ch. 13 to 24, 29, 58 ; *Methven* v. *Staten Island Light Co.*, 66 Fed. R. 113, 115 ; *In re Gellespie*, 15 Fed. R. 734, 735 ; *Robinson* v. *Marshall*, 11 Md. 255 ; *U. S.* v. *Wynona R. Co.*, 67 Fed. R. 960.    This doctrine also applies to assignments of insurance policies.    *Ex parte Colwil*, 1 Montague Bk. Cases, 113, 115 ; *Williams* v. *Thorp*, 2 Sims, 257, 263.    But, independent of the written assignment, the legal effect of the two agreements between C. R. Lewis and the appellants was to raise a trust in favor of the appellants by which they would be entitled to have the proceeds of insurance charged for their benefit, and for that purpose equity will look into the purposes of the agreement to see if a charge was intended to be made on the fund. *Story Eq. Jur.*, section 1231 ; *Johnson* v. *Johnson*, 40 Md. 189 ; *Alexander* v. *Ghiselein*, 5 Gill, 139, note 1 ; *Pomeroy Eq. Jur.*, sections 1233, 1235, 1237.    Where it appears from the agreement that the party making it intended to appropriate the fund mentioned therein, the Court will so regard it and enforce the agreement.    *Hanselt* v. *Harrison*, 105 U. S. 405.

2. Delivering the cans as required by the contract of sale, before the insurance money was received, and granting an extension by taking notes in consequence of the company's default, did not destroy the rights of the appellants to have the money, when collected, applied under the contract of sale.    This application by Lewis formed the inducement to the appellants in making the contract.    The subsequent agreement in requiring an assignment of the policies and their proceeds for their benefit, agreed to by Lewis to avoid suit and secure an extension of time for the payment of the debt, placed them in the position of purchasers for value. *Bowen* v. *Tipton*, 64 Md. 288; *Downing* v. *Blair*, 75 Ala.

216, 220; *Gilchrist* v. *Gough*, 63 Ind. 576, 583; *Webb on Record Title*, sec. 208.

3. When the Pocomoke Bank delivered the policies to Lewis, it placed it in his power to hypothecate them to third parties for value; such parties had the right to presume from the representations made by the holder that he was the owner of the policies. *Supplee* v. *Allen*, 31 Md. 543; *Casey* v. *Cavaroc*, 96 U. S. 490; *Merchants' Bank* v. *Farwell*, 58 Fed. R. 637. A continuation of possession of the policies by the bank was necessary to protect its claim against creditors for value for the reason they are not bound by latent equities. · *Ins. Co.* v. *Ross et al.*, 2 Md. Ch. 25 ; *A. & E. Ency. of Law* (2nd ed.). vol. 2, 1801. Where the pledgee, as holder of an imperfect pledge, has parted with the possession, although conditionally, he retains a mere equitable claim, which is analogous to an equitable mortgage or lien, and his rights are subject to those of subsequent creditors for value, upon the principle that credit was given to the party on the faith that he was the holder of the property and entitled to the possession *Textor* v. *Orr*, 86 Md. 393; *Lynch* v. *Murphy*, 161 U. S. 255.

4. The policies of insurance payable to Lewis, as mortgagee, did not pass by operation of law to the assignee of part of the mortgage debt.

*Joseph C. France* and *Francis T. Homer* (with whom was *George R. Willis* on the brief), for the Second Nat. Bank, appellant.

I. The delivery of the three single bills secured by the mortgage, and of the mortgage itself (if at all delivered), and of the policies of insurance to the Pocomoke City National Bank, did not invest it with any title to the insurance policies, nor did it, after the fire, give them any title to the proceeds thereof: (*A*) because no liability to pay the single bills attached to Lewis by the delivery thereof, or by the endorsement contained on one of the single bills, and hence, if the debt was, by the delivery of the three

single bills and the endorsement of one, vested in the Pocomoke City National Bank, the policies of insurance, even if they did not contain the provision for forfeiture in case of assignment without the assent of the insurance company, being given to protect Lewis, and Lewis alone, to the extent of his interest in the steamer "Lady of the Lake," could not enure to the benefit of the bank; (*B*) because the policies of insurance would not pass by operation of law to the assignee of the whole or any part of the mortgage debt, assuming there was such an assignment, where each policy contained on its face the provisions, (*a*), loss, if any, payable to C. R. Lewis (not to his assigns), mortgagee, as his interest may appear, and (*b*), that the assignment of the policies without the consent of the companies should operate as a forfeiture.

II. Even if, in view of the endorsement found on one of the three single bills, the delivery of said single bills, the mortgage and the policies of insurance be regarded as an equitable assignment of the mortgage and of the policies of insurance as an incident thereto, such assignment could be construed only as operating *pro tanto*, and the Pocomoke City National Bank and F. C. Lewis together, could at most claim but one-third of the net proceeds of these insurance policies.

III. That even though the contention of the Pocomoke City National Bank be adopted in either of the aforegoing propositions, nevertheless, the title of the Pocomoke City National Bank and Franklin C. Lewis would be only an equitable one, whereas the assignment to DuVal for the benefit of himself, the Second National Bank, Dickey, Tansley & Co. and others, establishes a legal title which was perfected by the notice given to the insurance companies and would, therefore, be paramount to the title of the Pocomoke City National Bank.

IV. That the delivery of the policies to Lewis, after the fire, without being ear-marked when they had become *choses in action*, and therefore assignable, placed it in the

latter's power to hypothecate or assign them to third parties, and such parties had a right to assume from the unqualified possession of the policies by Lewis, from his representations and from the disclosure of the records, with reference to the ownership of the mortgages by reason of the Act of 1892, chapter 392, that Lewis was the *bona fide* owner and holder of the policies, and subsequent purchasers would not be affected by latent equities existing between Lewis and the Pocomoke City National Bank, and this is true, even though the Pocomoke City National Bank may have held said policies as pledgee, for such conduct would destroy any rights which it may have had in that capacity.

V. That the Pocomoke City National Bank is estopped from claiming the funds deposited to the credit of this cause, on the ground that he who comes into equity must come with clean hands; and the bank having accepted those policies under claim of an assignment thereof, which it knew rendered them void as between themselves and Lewis on the one hand, and the insurance companies on the other, never disclosed its claim of an assignment until the litigation over the policies had been concluded by compromise of the suits brought and the collection of the funds (all of which was done at the expense and instance of the parties claiming under the assignment of October 18th, 1895, to E. B. DuVal), and then, having practised this fraud upon the insurance companies and the claimants under the said assignment to DuVal, after the fund had been recovered, comes into equity to claim the same.

VI. The Court erred in directing the costs to be paid out of the funds in this case to parties who were not entitled to a lien thereon.

*George M. Upshur* and *Charles G. Baldwin*, for the appellees.

1. The appellee, as assignee of the covenant to insure, contained in the mortgage, has in equity a perfect lien upon this fund even against subsequent *bona fide* purchasers

of the policies of insurance for valuable consideration without notice of any prior lien. The assignment of a debt carries collateral securities. 2 *Story's Eq. Jur.*, sec 1647 A; *Hunt* v. *Wilson*, 38 Cal. 263; *Byles* v. *Tome*, 39 Md. 463; *Ohio Life Ins. Co.* v. *Ross*, 2 Md. Chan. 34; *Demuth* v. *The Old Town Bank*, 85 Md. 323; *Thomas* v. *Von Kapff*, 6 G. & J. 380; *Giddings* v. *Seevers*, 24 Md. 363; *Wheeler* v. *Ins. Co.*, 101 U. S. 442.

The equitable liens of Charles R. Lewis, mortagee, pass to his assignee since equitable liens are assignable. "An equitable lien reserved by express agreement passes by an assignment of the debt it was created to secure." *Jones on Liens*, sec. 991, sec 28 and cases cited; *Ober* v. *Gallagher*, 93 U. S. 199; *Batesville Inst.* v. *Kaufman*, 18 Wall. 155; *Payne* v. *Wilson*, 74 N. Y. 348, page 35; *Taliaferro* v. *Bennett*, 37 Ark. 511; *Cambell* v. *Rankin*, 28 Ark. 401, overruling; *Sheppard* v. *Thomas*, 26 Ark. 617; *Jones* v. *Doss*, 27 Ark. 518.

2. The appellees obtained a perfect lien upon this fund by virtue of the pledge of the policies of insurance. *Ober* v. *Keating*, 77 Md. 102. It was the mutual understanding of the parties as shown in the evidence that these policies were intended as security for the loan, therefore the title passed to the Pocomoke City National Bank by delivery alone, and no indorsement was necessary. *Colebrooke on Collateral Securities*, p. 575, and cases cited; *Latham* v. *Chartered Bank of India*, L. R. 17 Eq. 605. Life Insurance Policies: *Duffner* v. *The Professional Life Insurance Co.*, 25 Bevan, 599 ; *Jones on Col.*, sec. 145 ; *Collins* v. *Dawley*, 4 Col. 138 ; *Norwood* v. *Guerdon*, 60 Ill. 253 ; *Merrill* v. *New Eng. Life*, 103 Mass. 245. Fire Ins. Policies : *Stout* v. *Yeager Milling Co.*, 13 Fed. Rep. 802. The clause in these policies prohibiting assignments without the consent of the insurance companies, does not apply to a pledge. *Colebrooke on Collateral Security*, p. 575, and cases cited ; *Jones on Col. Sec.*, sec. 147 ; *Ellis* v. *Kruetzinger*, 27 Mo.

311; 1 *Phil on Ins.*, sec. 98; 2 *Duer*, sec. 36; 10 *Serg. & R.*, 412.

It may be that the delivery back of the thing pledged ordinarily terminates the pledge, but not so if it was delivered to the pledgor for a special purpose only. *Citizens' National Bank v. Hooper*, 47 Md. 88; *Williams v. National Bank*, 72 Md. 441.

Where the assignment is by delivery merely, as in the case (*Taft v. Bowkers*, 132 Mass. 277) of a bank-book merely delivered as collateral, such assignment was held to be good against a subsequent trustee process, although no notice had been given to the bank. Also in case (*Norton v. Piscataqua Insurance Co.*, 111 Mass. 532) of a non-negotiable note, and numerous cases of life insurance policies. Also the case of *Latham v. Chartered Bank of India* (L. R. 17; Eq. 205), where the title to a fire insurance policy was held to pass by delivery as collateral security. The early rule in England, under which, as between *bona fide* assignees of the same negotiable *chose in action*, the one giving notice to the debtor was preferred, although becoming a holder for value without notice subsequently, has been overruled. *Colebrooke on Col. Sec.*, page 578; *Pickering v. Ilfracombe R. R.*, L. R. 3 C. P. 235; *Robinson v. Nesbitt*, L. R. 3 C. P. 264; *Beavan v. Oxford*, C. DeG. & M. & G. 492.

III. The appellants have never perfected any lien upon this fund. When Lewis, in February, 1895, made a contract with Dickey, Tansley & Co., and told the latter he would pay them one-half of their bill from the money due him from said policies, said promise did not constitute a pledge or an equitable assignment of the fund, because he gave said firm no control over the policies or the fund arising therefrom. *Christmas v. Russell*, 14 Wall. (U. S.) 69; *Rogers v. Hosack*, 18 Wend. (N. Y.) 319; *Chistmas v. Griswold*, 8 Ohio St. 563; *Pearce v. Roberts*, 27 Mo. 13. It therefore follows that Dickey, Tansley & Co. never had an equity in said policies. They took a legal assignment

of them, through DuVal, as trustee, on October 18th, 1895, but not having had a prior equity, neither the assignment nor the notice of it, given to Baldwin & Boston, could affect the rights of the Pocomoke Bank, because they took no more than Lewis could give and they were in no better condition than the assignee himself, and were, therefore, subject to the prior equities of the Pocomoke Bank, the first assignee.    However, Dickey, Tansley & Co. parted with nothing in consideration of said assignment, but took the same in consideration of an old debt; whereas, the Pocomoke Bank made their loan and parted with their money to Lewis upon consideration solely of the collaterals, including said policies assigned and deposited with it.    *Pomeroy's Eq.*, vol. 2, 685 ; *Bibend* v. *Liverpool Ins. Co.*, 30 Cal. 78 ; *Story's Conflict of Laws*, 8th ed., sec. 396 ; *Judson* v. *Corcoran*, 17 Howard, 612.

IV.  Whatever interest these appellants may have acquired was charged with notice of the prior lien of the appellees. " Where a man has sufficient information to lead him to a fact, he is deemed to be cognizant of it.    *Green* v. *Carly*, 39 Md. 229 ; *Price* v. *McDonald*, 1 Md. 403.    On February 27th, 1895, twelve days after the fire, Dickey, Tansley & Co. sold Lewis one million (1,000,000) cans.    Lewis told them he was going to get some insurance money and referred to their friend DuVal.    DuVal said, Yes, Lewis is entitled to some insurance money as *mortgagee*, and I have power of attorney to collect it, and also that he, DuVal, knew of no debts which Lewis owed.    Certainly then Du-Val and Dickey, Tansley & Co. were bound to know that there was a mortgage and what it contained, hence that there were mortgage notes, and where the notes referred to in the mortgage were.    So they were bound to know that the Pocomoke City National Bank held them as a pledge for four thousand dollars ($4,000).

V.  None of the subsequent assignees of Lewis parted with any valuable consideration for their assignments.  The DuVal assignment is supported by the alleged promise to

pay DuVal for his work, Dickey, Tansley & Co. for their cans and the past debt of Hughes-Taylor Can Co., *out of this money* when recovered. This promise does not constitute a lien upon the fund, and is not sufficient to sustain the subsequent written assignment, which is in no respect more of a lien upon the fund than the prior verbal promise was. Dickey, Tansley & Co. are not damaged by having accepted this assignment. If they had not have done so and had sued at law, as they allege to have threatened to do, they could have gained no lien or additional claim against this fund. So as against this fund their forbearance to sue was not a valuable consideration. *Giddings* v. *Seevers*, 24 Md. 376 ; *Von Kapff* v. *Thomas*, 6 G. & J. 38.

BOYD, J., delivered the opinion of the Court.

Charles R. Lewis sold to the People's Transportation Company, of Washington, D. C., a vessel named "Lady of the Lake," and in part payment therefor the company executed, on the 24th day of August, 1894, a mortgage on it for the sum of $30,000, payable in three equal payments of ten thousand dollars in four, eight and twelve months, respectively, with interest from date, " as evidenced by three bills obligatory of said corporation" of even date therewith. The mortgage was recorded in the Custom House at Washington City. Some question was made at the argument as to whether the evidences of debt were promissory notes or single bills, but not only the form of the instruments shows them to be the latter, but the description of them in the mortgage, as above quoted, indicates very clearly that they were so intended to be by the parties. We will, therefore, without further discussion of that question, treat them as such in the consideration of the case.

Franklin C. Lewis made application on behalf of his brother, Charles R. Lewis, to the Pocomoke City National Bank to discount the single bill which was payable four months after date, but being informed by the cashier that

the bank could not lend to any one person more than five thousand dollars, he returned on the 10th of September, 1894, with a note signed by himself and endorsed by Charles R. Lewis, and Charles R. Lewis and Company for five thousand dollars, dated September 1, 1894, and another for the same amount dated September 7th, which was made by Charles R. Lewis, endorsed by Franklin C. Lewis, and payable four months after date.    With them he left as collateral the three single bills, the mortgage and insurance policies on the " Lady of the Lake," amounting to thirty thousand dollars.    The single bill payable four months after date was endorsed in blank by Charles R. Lewis, but neither of the other two, nor the mortgage, nor the policies were endorsed.    The latter were issued to the Transportation Company, but were so framed as to be payable to Charles R. Lewis, mortgagee, as his interest might appear.    The note signed by Franklin C. Lewis as maker, was renewed for a month and then paid, and the other was finally reduced to four thousand dollars.    The single bill, which was endorsed by Lewis, was duly presented for payment, but was not paid.    On February 15, 1895, the " Lady of the Lake " was destroyed by fire, and on the 21st of that month Franklin C. Lewis presented a letter from Charles R. Lewis to the cashier of the bank requesting him to send the policies so that he could collect the insurance money, and promising to remit to the bank the amount due it out of the money so collected.    The cashier mailed the policies to Charles R. Lewis, in order that he "might collect the money and pay the debt for which they stood pledged," to use the language of the cashier.    Some of the policies proved to be worthless, but suits which had been brought on others were finally compromised for $8,500.00.    Messrs. Baldwin and Boston, the attorneys who collected the money, filed a bill of interpleader in the Circuit Court of Baltimore City, alleging that they had collected that amount and that after paying fees, expenses, etc., they had in hand $6,611.12, which was claimed by various creditors of Charles R. Lewis,

who were made parties to the proceedings. A decree was passed that the defendants interplead, and after considerable testimony was taken, another decree was passed directing that the fund be distributed in the following order:

1. To Edmund B. Duval, for services rendered and money expended by him in connection with the policies of the insurance upon the " Lady of the Lake," less such amount as he had received.

2. To the Pocomoke City National Bank the amount in full of its claim.

3. To Franklin C. Lewis the amount of interest paid by him to the bank as endorser for Charles R. Lewis, in subrogation to the rights of the bank.

4. To Edmund B. Duval, the Second National Bank of Baltimore and the Maryland Meter and Manufacturing Company, according to their respective priorities, as assignees under an assignment from Lewis to Duval, as trustee, of October 18, 1895. The costs were directed to be paid out of the fund and the entire amount being thus consumed, the bill was dismissed as to the other parties and the case referred to the auditor to state an account in accordance with the decree.

Charles E. Dickey and Charles H. Dickey, partners, trading as Dickey, Tansley and Company, and also as the Maryland Meter and Manufacturing Company, and the Second National Bank of Baltimore, appealed from the decree, but the other parties did not. The Dickeys also appealed from an order of the Court dismissing a petition filed by them on the 27th of October, 1898, which alleged that Franklin C. Lewis was a member of the firm of C. R. Lewis and Company and other matters, and prayed the Court to refer the case to an Examiner or the Auditor to take testimony on the the matters alleged, and not to sign a decree in the case pending said proceedings. It has been expressly decided by this Court in *Waring* v. *Turton, Trustee*, 44 Md. 546, that no appeal lies from an order dismissing a petition for a rehearing filed under very similar cir-

cumstances to those presented by the one in this case, and the appeal from that order will be dismissed.

As the main question to be determined by us is whether the claim of the Pocomoke Bank is superior to that of Duval, trustee, under the assignment of October 18th, 1895, we will first ascertain what rights became vested in that bank in September, 1894, when the single bills, mortgage and insurance policies were left with it, as above described, and then see how far, if at all, the bank's claim to the fund is affected by its sending the policies to Lewis on February 21, 1895, and by its subsequent conduct.

There can be no question but that the title to the single bill, which was endorsed by Charles R. Lewis, at that time became vested in the Pocomoke Bank, as collateral security for the debt he owed the bank. The endorsement in blank, accompanied by delivery, authorized it to fill up the blank with an assignment to itself, and it could have sued the maker in its own name. *Chesley* v. *Taylor*, 3 Gill, 251; *Jackson* v. *Myers*, 43 Md. 462; *Code*, Art. 8, section 1. It was wholly immaterial that it could not have sued Lewis as assignor, because it was not assigned under his hand and seal, as provided for by section 9 of the above-named Article of the Code. As it was only assigned as collateral, and Lewis was personally liable on the notes given by his brother and himself, it may have been thought unnecessary to take the assignment under his hand and seal, so as to thereby bind him, but however that may be, the assignment in blank gave the bank absolute control over it to the extent of the debt intended to be secured by it. The other two were not endorsed, but they were left with the bank as collateral, according to the testimony of Franklin C. Lewis, and Wm. F. King, the cashier, and indeed the bank still holds all three of them. The original proposition was to discount the single bill which first matured " upon the placing of all the above-named papers as collateral security to secure the payment thereof," and when the notes were taken with these collaterals, it is possible that only the one was

endorsed because it would mature before the notes would, and, if it had been paid, would have cancelled the indebtedness of Lewis to the bank.   But if it be true that all three were left as collateral (and the testimony of Messrs. Lewis and King is uncontradicted as to that), then the right of the bank to a priority in any fund derived from the mortgaged property, if it had been sold, might have been asserted on either of two grounds—notwithstanding two of the single bills were not endorsed.  In the first place, when a mortgagee assigns one of three notes, or single bills, secured by one mortgage, and delivers the other two, although not endorsed, to the assignee as collateral, that of itself is some evidence of the intention of the mortgagee to give the assignee of the one priority over the others, if the fund derived from the mortgaged property prove to be insufficient to pay them in full.  It is true that a mere assignment of one note does not give the assignee priority over others retained by the mortgagee, as was held in *Brown, Trustee*, v. *The Freestone M. & M. Co.*, 55 Md. 547, and other cases in this State; but in *Chew* v. *Buchanan*, 30 Md. 367, in discussing the question of priorities, the Court said : " Where the meaning of the parties has been expressed, *or can be inferred from their acts*, there has been no difficulty in disposing of the question;" and in *Dixon* v. *Clayville*, 44 Md: 573, the rule laid down in *Donly* v. *Hays*, 17 Serg. & Rawle, 400, was adopted.  It was there said that " different parties holding respectively the several notes, or being entitled to the several instalments or portions of the debt secured by one mortgage, *unless there be something in the terms of the contract to indicate a different intention*, stand in *equali jure*," and again that "the exception or qualification to this rule is where the assignor *by guarantee or otherwise*, becomes liable to the assignee for the payment of the installment, or part of the debt assigned.   In such case the assignor, if he continues to hold the other portion of the debt, would not be allowed to participate in the fund until the installment due the assignee is fully paid.   The effect

of a contrary rule would be to lead to a mere circuity of action." In this case the assignor, Lewis, was liable on the notes, which were given instead of the single bill which he intended to have discounted. It was all one transaction, and even if he had retained in his possession the two single bills, and the mortgaged property had been sold, and the proceeds had proven insufficient to pay the three in full, it would certainly have led " to a mere circuity of action " to permit him to receive a distribution on the two and require the bank to sue him for the balance due it, but the proof is conclusive that it was the intention of the parties to assign as collateral *the whole* of the indebtedness secured by the mortgage. His act in giving the two, though unendorsed, to the bank, was as distinct a declaration that the one endorsed was to have priority over them as if he had entered into a written agreement to that effect.

Again, a written assignment was not necessary but the mere delivery of a bond and mortgage as security is a valid pledge and will be so treated in a Court of Equity. *Crane v. Gough,* 4 Md. 334; *Kamena v. Huelbig,* 23 N. J. Eq. 78; *Galway v. Fullerton,* 17 N. J. Eq. 389; *Prescott v. Hull,* 17 Johns. (N. Y.), 284; *Runyan v. Mesereau,* 11 Johns. (N. Y.), 534; 18 *Ency. of Law,* 650. So on either ground the assignment of the one single bill and the delivery of the other two as collateral security, were sufficient to entitle the Pocomoke Bank to the benefit of any fund that could have been realized from them, to the extent of the debt for which they were pledged.

Independent of the Act of 1892, chap. 392, the assignment of the one single bill with the priority we have said was given, or of the three in the way we have stated, carried with it the mortgage and gave the bank the benefit of that lien. *Demuth v. Old Town Bank,* 85 Md. 323, and other cases there cited. But it is said that the Act of 1892 is applicable, and therefore Lewis was conclusively presumed to be the owner of the mortgage after maturity. That Act provided that the title to notes and other instruments

secured by mortgages shall, after the maturity of such notes, etc., be conclusively presumed to be vested in the person holding the record title to the mortgage, and if the mortgage is released of record, the notes, etc., secured by it, shall, after their maturity, be conclusively presumed to be paid, so far as any lien upon the property conveyed by the mortgage is concerned. The object of the Act was to avoid the complications that often arose by reason of the fact that the release of a mortgage by the mortgagee was not valid, unless he also owned the eviednces of debt secured by it, and hence it often left the titles to the mortgaged property involved, as the ownership of the evidences of debt was not necessarily, or usually, a matter of record. But without stopping to discuss the effect of that Act, under such circumstances as we have before us, if the mortgage had been recorded in this State on property located here, is it applicable to this case ? The mortgage was not recorded in this State but in the Custom House at Washington, District of Columbia. It can make no difference that the negotiation took place here, for if it was necessary to record the assignment, of course it must have been recorded where the mortgage was recorded, and could not have been elsewhere and accomplish what the law was designed to do. Although this mortgage was doubtless recorded under the Act of Congress applicable to bills of sale, mortgages, etc., on vessels, the question has been argued as if it had been recorded under the laws of the District of Columbia, and there is no evidence as to what the law is in the District. The authorities are not uniform as to whether the Courts of one State will presume, in the absence of anything to the contrary, that a foreign State has adopted the same statute that is in force where the case is pending. But it would be carrying such presumptions to an unreasonable extent to presume, without any proof to that effect, that there is a statute similar to the Act of 1892 in force in the District of Columbia, even if it be assumed that the mortgage was recorded under the laws in force there. That statute made a complete

change of the law on the subject in this State.    Prior to its
passage the mortgage followed the debt secured by it, and
became the property of the owner of the latter, but since
then the debt, after maturity, follows the mortgage and is
conclusively presumed to belong to the person holding
the record title to the mortgage.    Until 1892, if the ques-
tion had arisen in this State, in the absence of proof to the
contrary, it would have been presumed that the owner of
the single bills was the owner of the mortgage, for that was
and always had been the common law of this State, and the
common law would have been presumed to be in effect in
the District, and must it now be assumed that the Congress
of the United States passed a statute for the District simi-
lar to ours, contemporaneously with it, although the con-
trary was presumably the law in the District for the previous
hundred years?    When a statute thus radically changes
the common law of one State, there is no good reason to
presume that the Legislature of another State has done
likewise.

In *State, use Allen* v. *C. & P. R. R. Co.*, 45 Md. 41, this
Court, after stating that the presumption is that the common
law prevails in the State where the alleged wrong was done,
quoted with approval from *Whitford* v. *Panama R. R. Co.*,
23 N. Y 468, that " no such presumption obtains respect-
ing the positive statute law of the State.    There is, gener-
ally, no probability, in point of fact, and there is never any
presumption of law, that other States or countries have
established, precisely or substantially, the same arbitrary
rules which the domestic Legislature has seen fit to en-
act."    This Court, through JUDGE ALVEY, added, " this
presumption, as to the prevailing existence of the common
law, is indulged upon principles of comity and general con-
venience; but the Courts here will never apply to acts done
in a foreign jurisdiction, which may not be unlawful there,
the arbitrary rules that shall have been prescribed by our
Legislature, with respect to rights and remedies, wholly at
variance with the settled rules of the common law."    See

also *Kelley* v. *Kelley*, 161 Mass. 111; *Ellis* v. *Maxson*, 19 Mich. 186 ; *McCullock* v. *Norwood*, 58 N. Y. 564; *Harris* v. *White*, 81 N. Y. 532. Other authorities might be cited, but we think it clear that the Legislature only intended this Act of 1892 to apply to mortgages recorded in this State, as it could control no others, and that there can be no presumption that a similar statute was in force in the District of Columbia. But, as we have already intimated, we do not understand from the evidence before us that the mortgage was recorded in the records of the District of Columbia, but only at the Custom House, under the laws of the United States applicable to bills of sale, mortgages, etc., on vessels. We take judicial notice of Act of Congress of such public character (12 *Ency. of Law*, 155; *Easterwood* v. *Kennedy*, 44 Md. 563), and are not aware of any such statute similar to ours. If this were not so, we certainly would not presume that Congress had passed such a law, merely because our Legislature saw fit to radically change the law that had previously been in force here. So we cannot apply the Act of 1892 to this case, but must treat the Pocomoke Bank as the *bona fide* holder of the single bills (undoubtedly of the one with priority over the others, and in this case that is immaterial, as the one more than covers the amount realized), and the owner of the mortgage, so far as necessary for the protection of the debt due the bank.

That being so, what interest did that bank acquire in the insurance policies? " Insurance policies may be pledged with or without a written assignment." 18 *Ency. of Law*, 651, and cases cited in note 2; *Colebrooke on Collateral Securities*, 712. Delivery alone will at least give an equitable title to the pledgee. *Soule* v. *Union Bank*, 45 Barb. 111; *Chapman* v. *McIlwrath*, 77 Mo. 38. The mortgage required the insurance to be taken and the policies were a part of the security given. It has been suggested that they prohibited assignments without consent of the companies. The companies might not have raised that objection to the validity of the policies, but if they had, it would have been

of no avail, as such provisions do not apply to pledges. *7 Ency. of Law*, 1026; *Ellis* v. *Kreutzinger*, 27 Mo. 311; *True* v. *Manhattan F. Ins. Co.*, 26 Fed. Rep. 83; *Griffey* v. *N. Y. Central Ins. Co.*, 100 N. Y. 417; *Colebrooke on Col.*, sec. 712. See also Judge Miller's opinion in *Washington Fire Ins. Co.* v. *Kelley*, 32 Md. 457. So, up to the time of the fire the Pocomoke Bank held at least an equitable interest in the single bills, the mortgage and the insurance policies, and if there was any question about the right of Lewis to assign the policies before the fire, there can be none about such right after the fire took place. *7 Ency. of Law*, 1025, and notes; *Consolidated R. E. & F. Ins. Co.* v. *Cashow*, 41 Md. 78; *Whiting* v. *Independent Mutual Ins. Co.*, 15 Md. 313. The bank still held them and if the assignments had been previously ineffective, by reason of the prohibition against assignment without the consent of the insurers, surely a Court of Equity should treat them as valid when Lewis was authorized to make them. *That was before the appellants even claimed to have secured any interest in them.* They were then *choses in action* and an equitable assignment of them could be made by parol. *Crane* v. *Gough, supra.*

Did the bank's subsequent conduct cause it to lose the benefit of them? As we have seen, on February 21, 1895, it sent them to Lewis for the purpose of letting him collect the money due, out of which he was to pay the bank. At that time only about five thousand dollars was due by Lewis to the bank, and the policies amounted to over thirty thousand dollars. The surrender of the policies under the circumstances did not terminate the pledge, as they were sent to Lewis for the express purpose of collecting the money to pay the bank. *Citizens' Bank* v. *Hooper*, 47 Md. 88. But after he got possession of them he undertook to give other parties interests in them without informing them of the Pocomoke Bank's claim. Charles E. Dickey testified that on the 27th of February, 1895, his firm made a contract with Lewis for the delivery of one million 3-pound

cans at eighteen dollars per thousand, in March, April, May and June; that the terms of sale were one-half cash and one-half on the first of November; that Lewis stated to him at the time that he had a claim of thirty thousand dollars against insurance companies " for loss of a steam-boat or something or other, out of which money he expected to pay one-half of his bill of cans in cash payment," and that the matter was in the hands of E. B. DuVal & Company, through whose hands the money was to come; that on seeing Mr. DuVal he confirmed it. Just when he saw DuVal is not clear. The inference to be drawn from DuVal's evidence is that it was not until the day of the assignment in October, 1895. The testimony does not satisfactorily show the exact time that Lewis placed the matter in the hands of DuVal. He had on March 1, 1895, given James V. Wagner a power of attorney to settle, adjust, demand and receive the money on the policies, and it was not earlier than March the 7th that DuVal got the policies. He testified that it was either that or the next day, whilst Mr. Littig said they were not delivered until after the 15th of March, 1895 He certainly did not have them as early as February 27th, and the first power of attorney Lewis gave him was dated the 14th of March, 1895, and the Transportation Company gave him one dated the 15th of that month. Lewis executed another to DuVal on the 11th of October, 1895, and on the 18th of that month executed an assignment of all his interest as mortgagee of the steamer " Lady of the Lake," with authority to pay out of the proceeds, (*a*) DuVal's account against him, (*b*) the Second National Bank of Baltimore, (*c*) the Maryland Meter and Manufacturing Company, (*d*) the Marine Bank and Merchants' Bank, *pro rata*, for any deficit in their claims not secured by certain life insurance policies, and (*e*) the balance to Lewis. It cannot be pretended that there was any actual assignment for the benefit of the appellants before the 18th of October, 1895, and the evidence of Mr. Dickey falls far short of establishing any lien, legal or

equitable, on this insurance fund in February, 1895.   It
was a mere promise to pay on the part of Lewis and a
statement by him as to where he expected to get the money
with which to make the cash payment.   Nor can it be said
that the failure of the Pocomoke Bank to have the policies
endorsed to it could have misled Mr Dickey when he
made the contract for the cans with Lewis, for there is not
the slightest evidence that he saw the policies then, or even
afterwards, and hence could not have been misled by their
contents.   Nor has the Second National Bank any claim,
excepting what it acquired through the assignment of Oc-
tober 18th.   The power of attorney and the assignment to
DuVal show on their face that Lewis' interest was merely as
mortgagee, and indeed DuVal had procured the policies
which had the endorsement on them for the benefit of
Lewis, mortgagee.   He originally obtained the insurance
on the steamer for Lewis when he owned it, and then had
the transfers made (including some new policies) when the
Transportation Company purchased it.   DuVal was, there-
fore, fully cognizant of the fact that Lewis' interest was
only as mortgagee.   It was clearly his duty to ascertain
what the mortgage contained, and if he had, he would have
seen that it secured three single bills, the ownership of which
he should have traced, if he wanted to ascertain what
Lewis' interest was.   As the appellants can only claim
through the assignment to DuVal, they are bound by his
knowledge, and, moreover, he showed the assignment to
Dickey, Tansley and Company.

Considerable stress is laid on the fact that that firm had
arranged security for costs to prevent the suits from be-
ing dismissed.   That was a very natural thing for them to
do.   They not only supposed they had an interest in the
suits, but they actually did have, for if the plaintiff had recov-
ered what was due on the policies they would probably have
been paid all that he owed them.   But that act can give them
no claim on this fund, as they lost nothing by it.   The suits
were brought in the name of Lewis and the fees and costs

connected with them have been paid. It cannot even be assumed that the officers of the Pocomoke Bank would have refused to aid in the suits if they had been called upon. Mr. King testified that he did not know of any attempted assignments of the policies by Lewis until sometime in 1896, when he at once communicated with Messrs. Baldwin and Boston and others. He had confidence in Lewis and doubtless believed that he would pay the amount due the bank out of the proceeds of the policies, as he had undertaken to do, until he ascertained that he had been attempting to dispose of the policies to others. His statement in answer to a question on cross-examination explained his position. He said, "we still held the notes of the People's Transportation Company, Washington, D. C., notes heretofore referred to, and as they represented the only interest that Charles R. Lewis had in these insurance policies, I thought we would be reasonably safe in granting his request to send him the policies." So without discussing all the questions suggested, we are of the opinion that the appellants had no claim, legal or equitable, to these policies or the funds to be derived from them, excepting such as they acquired through the assignment to DuVal (which was long after Lewis became indebted to them) and they took that subject to the prior claim of the appellee.

The evidence shows that the collaterals were not only to protect the bank, as holder of the notes, but Franklin C. Lewis as endorser, and, in so far as he has paid any part of the claim to the bank, he is entitled to be subrogated, as there is no evidence that he was the partner of C. R. Lewis, or in any way interested, excepting as an accommodation endorser. Of course his claim is subject to that of the Pocomoke Bank.

The only other question that we are called upon to discuss, in addition to the costs of the case, is the part of the decree that provides for the payment of DuVal's claim for services rendered and money expended by him in connection with these policies. The effect of that part of the de-

cree is to make the beneficiaries under the assignment of October 18, 1895, pay for all expenses incurred in securing this money. That we do not deem equitable. The appellants had no knowledge of the claim of the Pocomoke Bank when the settlement was made, and it is possible that if they had had, and if they supposed such costs as these were to come out of the fund, at their expense, they would not have consented to a settlement on the terms that the suits were compromised for. DuVal can only be allowed anything on the theory that his services and the money were necessary, or at least contributed to the recovery of the fund. Without his aid, possibly, nothing would have been recovered, as he aided in the preparation of the proofs of the loss and getting evidence that was material. Under such circumstances it is not right that the Pocomoke Bank should not only not be at any expense itself, but even require others to expend their money for its benefit, as that is practically what is done if the fund which would otherwise go to the appellants must pay for DuVal's services. We cannot in the present condition of the record determine what compensation should be allowed to DuVal under this clause of the decree, and we do not want to be understood as intimating that we think he should be allowed such an amount as is claimed by the account he has filed. On its face it appears out of all proportion to the results and some of the items do not seem to be covered by this provision of the decree, but the Court below authorized the taking of additional testimony before the auditor for the purpose of establishing the amounts of the respective claims, which can still be done when this cause is remanded. Whatever this claim of DuVal is determined to be, it should be paid proportionately by the parties entitled to the fund. The costs, including those in this case and the amount retained by Messrs. Baldwin and Boston ($1,888.88) for fees, expenses, etc., should also be paid by the parties in proportion to the amounts they would receive, were it not for the costs and DuVal's preferred claim. This we deem equitable and in accordance

with the general principle stated in *Tome* v. *King*, 64 Md. on page 182. They were, presumably, necessarily incurred and all the parties should contribute to them. For illustration take the amount of the fund recovered, $8,500, out of which (excluding the costs and DuVal's preferred claim) assume there would be due the Pocomoke Bank $4,000, F. C. Lewis $600 and the parties under the assignment of October 18th, 1895, $3,900, and that the costs (including amount retained by Messrs. Baldwin and Boston) and Du-Val's claim, entitled to preference under the decree, would together amount to $3,400 or 40 per cent. of the whole. There should be distributed to the costs and DuVal (of course separating them) $3,400, to the Pocomoke Bank $4,000, less its proportion of the costs and DuVal's claim (40 per cent.) which would be equal to $1,600, leaving due it $2,400 and so on with the others. We do not want to be understood as fixing the above amounts as due the respective parties, but only use those figures for illustration.

It follows from what we have said that the decree must be affirmed in part and reversed in part, and the cause remanded, so that an audit can be stated in accordance with this opinion.

*Appeal from the order dismissing the petition of October 27, 1898, dismissed and the decree of the 12th day of November, 1898, affirmed in part and reversed in part, and cause remanded, the costs above and below to be paid out of the fund as directed in the opinion.*

(Decided April 5th, 1899).