## S. J. Marx Company's Trustee v. Marx, et al.

(Decided January 31, 1928.)

(As Extended March 23, 1928.)

### Appeal from Fayette Circuit Court.

1. Pledges.—Delivery, either actual or symbolic, of the thing pledged, by pledgor to pledgee, is essential in order to create lien of pledge.

2. Pledges.—Possession of pledged article must be retained by pledgee in order to preserve his lien, and a voluntary and unconditional surrender of the pledged article by pledgee to pledgor extinguishes lien.

3. Pledges.—Pledgee held not to lose lien of pledge, where it delivered possession of pledged sugar to pledgor under express agreement that it was to be sold for pledgee's benefit and received proceeds immediately after sale, and hence pledgee was entitled to retain such proceeds.

4. Evidence.—Affirmative answer to question whether witness has understanding that pledgor, to whom possession of pledged sugar was delivered, would turn back proceeds of its sale when he collected it to pledgee held mere conclusion.

5. Pledges.—Pledgee held to have lost lien on pledged sugar, where evidence showed that it released and surrendered possession of pledged sugar to pledgor voluntarily and unconditionally and was sold by pledgor for its own credit.

6. Fraudulent Conveyances.—Payments by debtor to creditor held preferential and fraudulent as to other creditors, within Ky. Stats., sec. 1910, where debtor was hopelessly insolvent and creditor receiving payments could not have but known that fact.

7. Fraudulent Conveyances.—Evidence held to show that chattel mortgage on automobile trucks, executed by debtor simultaneously with loan of $1,750 to him by mortgagee, was made in good faith and was not assailable as preferential and fraudulent, within Ky. Stats., sec. 1910.

8. Appeal and Error.—Judgment of chancellor finding that chattel mortgage executed simultaneously with loan to mortgagor was made in good faith and was not fraudulent and preferential, within Ky. Stats., sec. 1910, will be affirmed by Court of Appeals, where, upon a consideration of the whole case, it cannot say with reasonable certainty that the chancellor erred.

THOMPSON & THOMPSON and LOUIS J. TOOMBS for appellant.

JOHNSTON & YANCEY, FARMER & FARMER and W. E. NICHOLS for appellees.

OPINION OF THE COURT BY COMMISSIONER SANDIDGE— Reversing.

Prior to January 5, 1922, S. J. Marx Company, a corporation, had engaged in the wholesale grocery business in Lexington, Ky. On that date it filed a voluntary petition in bankruptcy. Appellant, W. B. Martin, thereafter was elected trustee in bankruptcy and qualified as such. In that capacity he instituted this action in the Fayette circuit court to recover as assets of the bankrupt corporation $1,000 paid by it to appellee Guaranty Bank & Trust Company, on December 30, 1921; $1,750 paid by it to the same bank on December 31, 1921; and $2,150 paid January 4, 1922, upon the theory that the payments were preferential and fraudulent. The bank defended upon the theory that the payments to it were made on debts secured by lien on personal property which had been pledged to it and which the bankrupt sold for it, the proceeds being used to make the questioned payments; hence, that they were not fraudulent or preferential. The trial below on this feature of the case resulted in a judgment for the bank, and the trustee in bankruptcy has appealed.

These facts appear: In July, 1921, a carload of sugar in bags arrived in Lexington, Ky., consigned to the S. J. Marx Company. The bill of lading with draft attached was forwarded to one of the Lexington banks. S. J. Marx Company borrowed from appellee Guaranty Bank & Trust Company the money with which to procure the bill of lading. It then stored the sugar with the Union Warehouse Company, a public warehouse, and the

warehouse receipt was assigned and delivered by it to the bank as security for the payment of the money so borrowed. In other words, the sugar was pledged to the bank to secure the payment of the note, and unquestionably the bank obtained a lien on it.

It is the universal rule with reference to pledges of personal property as security for debt that possession, either actual or symbolic, of the thing pledged must be delivered by the pledgor to the pledgee, in order to create the lien. Little v. Berry (Ky.) 113 S. W. 902; Petitt & Co. v. First National Bank, 4 Bush (67 Ky.) 334; Ferguson v. Northern Bank of Kentucky, 14 Bush (77 Ky.) 555, 29 Am. Rep. 418. It is the pledgee's possession of the article pledged that serves to give the world notice of his lien and claim. The rule is also equally as uniformly adhered to that the pledgee must retain possession of the pledged article in order to preserve his lien, and that a voluntary and unconditional surrender of the pledge to the pledgor extinguishes the lien. The principle is thus written in 21 R. C. L. 655:

> "As already seen, it is uniformly held that in the case of a pledge only a special title passes to the pledgee, which depends on actual possession, while the general right of property remains in the pledgor; and, in order to hold and preserve his lien, there must be not only a physical delivery, where the chattel can thus be transferred, but continued possession also retained. And in the absence of fraud or a special bailment, a pledge will be deemed to be waived or lost by the voluntary and unconditional surrender of the pledged property by the pledgee to the pledgor."

See, also, to the same effect, Jones on Pledges, p. 28, sec. 40, and Story on Bailments, p. 267, sec. 299.

There are a number of circumstances under which possession of the pledge may be surrendered by the pledgee to the pledgor without losing the lien which are spoken of as exceptions to these general rules. In a number of cases, where, by fraudulent means, possession of the pledge has been obtained by the pledgor from the pledgee, it has been written that the lien was not lost. Also numbers of opinions have been written in cases where the pledgee delivers the pledge to the pledgor for a specific purpose and under such circumstances that the pledgor becomes the agent or special bailee of the

pledgee in possessing the pledge, holding that the pledgee does not thereby lose his lien. These cases are perhaps not, strictly speaking, exceptions to the general rule which forbids voluntary and unconditional surrender of the pledged property by the pledgee under penalty of losing his lien. Among this last class of cases it has often been written that the pledgee may, without losing his lien, deliver the property over to the pledgor for the express purpose of selling it for the benefit of the pledgee. In these cases the pledgor is the agent or special bailee of the pledgee, and his possession in that capacity is the possession of the pledgee.

Under these principles and the numerous cases declaring them, appellee seeks to uphold the judgment appealed from. Particularly are the cases Dickey v. Pocomoke City National Bank, 89 Md. 280, 43 A. 33; Leahy v. Simpson, 60 Mo. App. 83; Clark v. Iselin, 21 Wall. 360, 22 L. Ed. 568; Samson v. Rouse, 72 Vt. 422, 48 A. 666; Castlé v. Hickman, 41 P. 1036;* Hays v. Riddle, 3 N. Y. Super. Ct. 248; Way v. Davidson, 12 Gray (Mass.) 465, 74 Am. Dec. 604—relied upon by appellee. Fault cannot be found with the principles relied upon, and the cases cited fully sustain them. The difficulty presented by the appeal is in the application of these principles of law to the facts of this case.

As to the $2,150 paid January 4, 1922, the court encounters no difficulty. Unquestionably the judgment of the chancellor as to this item is correct. It appears from the evidence that on that date there remained in the warehouse only 385 bags of the carload of sugar which had been pledged to the bank, and it was withdrawn from the warehouse on the order of the bank and sold by S. J. Marx Company for the benefit of the pledgee, and in conformity with the agreement to that effect when permitted to be withdrawn, the proceeds of this particular sugar were taken immediately after the sale to the bank and paid to it in part satisfaction of the debt which the sugar had been pledged to secure. The correctness of the chancellor's judgment as to this item is not seriously questioned by brief for appellant, and undoubtedly was correct under the principles above adverted to.

As to the $1,750 paid December 31st, and the $1,000 paid December 30th, this court is constrained to the view that the judgment of the chancellor is erroneous. The

---

*Reported in full in the Pacific Reporter; not reported in full in 109 Cal. xvi.

sugar was pledged to appellee bank in July, 1920. The record does not indicate the date when any of it was withdrawn except the 385 bags above referred to. S. J. Marx, who was the president and general manager and chief stockholder of the bankrupt corporation, testified that it was withdrawn from time to time after it was pledged in July. In each instance when withdrawals were made, the bank gave a written order which simply directed the warehouse to deliver the number of bags of sugar specified to S. J. Marx Company. As to this S. J. Marx testified:

"Q. You had 385 left in there on December 30th? A. 380 or 385, some place in there.

"Q. When was the other drawn out? A. There had been withdrawals all along. There had been withdrawals from July on.

"Q. On this particular warehouse receipt, can you recall when the balance of the 600 bags was withdrawn? A. No; I can't recall, because there was a number of warehouse receipts, and I don't know just which warehouse receipt that was withdrawn from.

"Q. How did you withdraw the sugar covered by warehouse receipts? A. When I wanted a bag of sugar, I went to the bank, and they issued an order to the Union warehouse for so many bags of sugar; receipt stated, and card."

He testified to no agreement with reference to these withdrawals, and from his testimony the pledged sugar appears to have been released and surrendered by the pledgee to the pledgor voluntarily and unconditionally. The only other evidence on the question of these releases of the pledged sugar was that of Frank L. Snyder, cashier of appellee bank, as follows:

"Q. I will ask you, when you would make these releases, if it is not a fact, that you usually received the money before making them, as a rule? A. We sometimes did, and sometimes did not.

"Q. When you would not receive the money before you made the release, what arrangements would you have? A. If I remember right, some of this sugar was sold on a certain length of time. He did not give us the money until he got the return back.

"Q. When he got the money, you had an understanding—when he collected it, he would turn it back to the bank? A. Yes, sir."

The second question certainly offered appellee bank the opportunity to bring these transactions within the principles of law invoked by it, but the answer equally as certainly failed to do so. The third question, extremely leading, when literally construed, may have been answered in the affirmative as it was without anything ever having been said to or by the pledgor to whom the sugar was being released, the affirmative answer being based entirely on what the agent of the pledgee had in his own mind. The affirmative answer to this leading question, as propounded, was but a conclusion, and there is no testimony that any agreement was reached before the sugar was released or any condition imposed that it be sold by the pledgor for the account of the pledgee, so as to bring this transaction within the principles of law invoked by appellee bank. In any event, the evidence fails to establish that the $1,000 paid December 30th or $1,750 paid December 31st were proceeds of sugar which had been pledged to appellee bank. It appears that, from time to time, when applied to, the bank would permit withdrawal of sugar from the warehouse, all of which was delivered to the pledgor. It was sold by S. J. Marx Company, the pledgor, not for the credit of the bank to whom it had been pledged, but for its own credit. Its proceeds when collected were appropriated by S. J. Marx Company to its own uses and it is impossible to trace the proceeds of the pledged sugar into the fund from which the payments were made. As to the $1,750 paid December 31st, it is admitted to be the proceeds of a loan made by a third person to the S. J. Marx Company on that date to secure which that company gave the lender a mortgage on two trucks owned by it. Under these facts, this court is constrained to the view that appellee bank lost its lien.

As to the portion of its debt collected on December 30 and 31, 1921, amounting to $2,750, it was unsecured. If these two payments were made after insolvency and for the fraudulent purpose of preferring the bank, one of the bankrupt's creditors, the transactions fall clearly within the provisions of section 1910, Kentucky Statutes, and recovery of the sums so paid by the trustee in bankruptcy for the benefit of the general creditors of the bankrupt was authorized. The record establishes beyond

question that when the payment of $1,000 on December 30th and $1,750 on December 31, 1921, were made, the S. J. Marx Company was hopelessly insolvent, and under the facts appearing could not but have known that fact. As to these two payments, there is no alternative but to hold that they were preferential and fraudulent, under the provisions of section 1910, Kentucky Statutes. This court is constrained to the view that the chancellor erred in not so adjudging. As to them, judgment for appellant, with interest as prayed, should have gone.

As has been indicated, the $1,750 paid by the bankrupt corporation to appellee bank on December 31, 1921, was money borrowed on that day. It appears to have been borrowed from Dr. L. T. Marshall, and simultaneously therewith the corporation executed and delivered to him a mortgage on two trucks owned by it. This transaction was also attacked as fraudulent and preferential by the trustee in bankruptcy herein, but as to it the chancellor dismissed the petition. Section 1910, under which this transaction was attacked, expressly provides:

"But nothing in this article shall vitiate or affect any mortgage made in good faith to secure any debt or liability created simultaneously with such mortgage, if the same be lodged for record within 30 days after its execution."

The mortgage to Dr. Marshall was lodged for record within the time specified. Dr. Marshall testified herein that he was in utmost good faith in lending the $1,750 to S. J. Marx Company, and in taking a mortgage on the trucks to secure him in the payment thereof. He testified that he had no intimation or information that the corporation was insolvent, and no reason to suspect that it was. It was shown that he and S. J. Marx and one of the executive officials of the Guaranty Bank & Trust Company were close personal friends, frequently dined together, and engaged in recreational sports and pastimes together, and that the proceeds of this loan were paid to that bank. These facts are sought by appellant to be sufficient to overcome the positive testimony of Dr. Marshall as to the bona fides of the transaction. The chancellor adjudged otherwise, and the record is such that it cannot be said with reasonable certainty that in so concluding the chancellor was in error. The rule is that, if, upon a consideration of the whole case, the mind be left in such doubt that it cannot be said with reasonable

certainty that the chancellor has erred, the judgment will be affirmed. As to the transaction between Dr. Marshall and the S. J. Marx Company, the facts hereof bring the case within that rule. Consequently, in this particular the judgment will be affirmed.

For the reasons indicated, the judgment herein is reversed and the cause remanded, with direction that a judgment in conformity herewith be entered.