*In the Matter of the Petition of Featherfall Restoration LLC*, No. 1313, September Term 2022.  Opinion by Getty, Joseph M., J.

**HEADNOTES:**

**INSURANCE – INSURANCE POLICIES – ANTI-ASSIGNMENT CLAUSES**

Maryland law recognizes the validity of anti-assignment clauses in insurance policies. Maryland has not adopted Section 322 of the Restatement (Second) of Contracts, which distinguishes between pre- and post-loss assignments of benefits.  When an insurance policy contains a valid anti-assignment clause, the clause prohibits assignments regardless of whether the claim was assigned before or after a loss occurs.

**INSURANCE – STANDING – HEARING BEFORE INSURANCE COMMISSIONER**

Section 2-210(a) of the Insurance Article of the Maryland Code (1995, 2017 Repl. Vol.) allows a "person aggrieved" by the Insurance Commissioner's act or failure to act to request a hearing before the Commissioner.  To be a "person aggrieved," a party must have an adversely-affected interest different from that of the general public.  When an assignment of benefits is found to be void because of an anti-assignment clause, the party with the purported assignment does not have a discrete interest and cannot request a hearing.

**INSURANCE – STANDING – UNFAIR CLAIM SETTLEMENT PRACTICES COMPLAINTS**

Section 27-301 of the Insurance Article of the Maryland Code (2011, 2017 Repl. Vol.) provides "an additional administrative remedy to a claimant for a violation of this subtitle." Maryland Insurance Administration regulations define "claimant," limiting it to someone "asserting a right to payment under an insurance policy to which the person is insured" and "any person asserting a claim against a person insured under an insurance policy."  Md. Code Regs. 31.15.07.02B(4), (11).  To bring a complaint alleging unfair claim settlement practices, a person must meet one of these definitions.

**INSURANCE – UNFAIR CLAIM SETTLEMENT PRACTICES VIOLATIONS**

When a complainant alleges that an insurance company is engaged in unfair claim settlement practices that amount to a general business practice, Md. Code (2011, 2017 Repl. Vol.) Ins. Art. § 27-304, the complainant must demonstrate that the company consistently engages in prohibited practices to meet the "general business practice" requirement.

Circuit Court for Baltimore City
Case No. 24-C-22-002071

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1313

September Term, 2022

_____

IN THE MATTER OF THE PETITION OF
FEATHERFALL RESTORATION LLC

_____

Nazarian,
Tang,
Getty, Joseph M.
  (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Getty, J.
_____

Filed: March 7, 2024

* Arthur, Kevin F., J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

This case concerns whether, under Maryland law, anti-assignment clauses in insurance policies are valid, including when a purported assignment of a claim arises after the occurrence of a loss.

Travelers Home and Marine Insurance Company ("Travelers") insured a home in Potomac, Maryland. In May 2020, the insured homeowners filed a claim with Travelers, believing that damage to the home's roof was the result of a storm and was thus covered under their home insurance policy. Simultaneously, the homeowners contracted with Featherfall Restoration LLC ("Featherfall") for any work that would be needed to fix the roof. As part of this agreement, the homeowners signed an "Assignment of Claim" that purported to give Featherfall rights related to the claim under the Travelers insurance policy. Travelers denied the claim after an inspection of the roof showed that the damage resulted from normal wear and tear and therefore was not covered under the insurance policy.

After Travelers informed the homeowners that the claim had been denied, Featherfall alerted Travelers to the Assignment of Claim. Travelers, however, refused to recognize the assignment, relying on an anti-assignment clause in the insurance policy that voided any assignment of the policy made without Travelers' written consent. Featherfall then filed a complaint with the Maryland Insurance Administration ("MIA"), alleging that Travelers' refusal to recognize the assignment and subsequent lack of communication with Featherfall about the claim were violations of the Insurance Article of the Maryland Code. The Insurance Commissioner ("Commissioner") ultimately concluded that the assignment

was not valid and that Travelers had not violated the Insurance Article, decisions that were affirmed upon judicial review in the Circuit Court for Baltimore City.

Featherfall presents the following questions[1] for review:[2]

---

[1] Featherfall also presented the following question:

> Did the trial court err in refusing to consider Featherfall's request for declaratory relief when the Circuit Court had an independent basis for jurisdiction, apart from the administrative appeal, Travelers was served and joined as a party defendant in the case, and the MIA remedy was not exclusive and failed to afford adequate relief?

Because we ultimately agree with the Commissioner and circuit court that the anti-assignment clause voided the attempted assignment of the insurance claim, we do not address this question because Featherfall's requested declaration is an inaccurate statement of Maryland law.

[2] MIA phrased the questions presented as:

1. Did the Commissioner correctly find that Maryland law does not prohibit an insurance policy from containing an anti-assignment provision as it relates to a policyholder's rights or benefits under the policy to an outside party?

2. Did the Commissioner properly find that Featherfall—a non-party to the insurance policy not empowered to take an assignment under the policy—could not be an aggrieved party with the right to demand a hearing before the Insurance Administration?

3. Did the Commissioner properly find that there was no violation of the Insurance Article by Travelers as a matter of law, irrespective of any refusal to acknowledge Featherfall's attempt to purchase an assignment of policy rights?

4. Did the circuit court correctly reject Featherfall's attempt to convert its petition for judicial review of an administrative agency decision into a declaratory judgment action?

Travelers phrased the questions presented as:

(continued)

2

1. Did [the] trial court err in affording deference to and affirming the MIA's ruling of law that anti-assignment clauses in property insurance policies preclude post-loss assignments of claims?

2. Did the trial court err in failing to issue a declaration or otherwise rule that the Assignment of Claim Benefits at issue did not violate the contractual provision of the subject insurance policy stating that "Assignment of this policy will not be valid unless we give our written consent?"

3. Did the trial court err in affirming the MIA's decision that Featherfall as assignee of insurance benefits from Travelers was not a "claimant" or "aggrieved" with standing to challenge Travelers' unfair claims settlement practices with respect to the claim assigned?

4. Did the trial court err in affirming the MIA's decision [] that Travelers did not commit unfair claims settlement practices prohibited by §§ 27-303(6) and/or §§ 27-304(2) and (4) by refusing to recognize Featherfall's assignment of policy rights associated with the subject claim?

5. Does Maryland still follow the majority of States and the Restatement of Contracts § 322(2) which distinguish between assignment of an insurance contract and assignment of rights or benefits granted by the contract, and permit post-loss [assignments of benefits] despite standard anti-assignment clauses?

---

1. Did the Commissioner correctly determine that the assignment of all rights under the policy to Featherfall without Travelers' consent was invalid and unenforceable under the plain language of the anti-assignment clause and Maryland law?

2. Did Featherfall have standing to file an administrative complaint against Travelers under IN § 27-301 and compel a hearing before the Administration under IN § 2-210?

3. Did the Circuit Court err in denying Featherfall's requested declaratory relief?

4. Did Travelers commit an unfair claims settlement practice under IN §§ 27-104, 27-303 or 27-304 when it declined to discuss the terms of an unassignable insurance policy with a purported assignee?

For the following reasons, we will affirm the decision of the circuit court.

## BACKGROUND

### A. *Maryland Insurance Law*

#### 1. *Insurance Article*

The Insurance Article of the Maryland Code is the basis of Maryland's statutory scheme regulating insurance companies. As a general overview, in 1963, the General Assembly repealed Article 48A of the Code, entitled "Insurance," and replaced it with a new Article 48A, entitled "Insurance Code," "to comprehensively govern and control insurers and the insurance business in Maryland." *State Ins. Comm'r v. Nat'l Bureau of Cas. Underwriters*, 248 Md. 392, 295–96 (1967). Under Maryland's Code Revision, Article 48A was recodified as the Insurance Article in 1995.[3]

Title 27 of the Insurance Article ("Unfair Trade Practices and Other Prohibited Practices") is at the heart of Featherfall's claims. Md. Code (2011, 2017 Repl. Vol.), Ins. §§ 27-101 *et seq.* Section 27-102 contains a broad prohibition that "[a] person may not engage in the State in a trade practice that is defined in this title as, or determined under this title to be, an unfair method of competition or an unfair or deceptive act or practice in

---

[3] "Code revision is a periodic process by which statutory law is re-organized and restated with the goal of making it more accessible and understandable to those who must abide by it." *Smith v. Wakefield, LP*, 462 Md. 713, 726 (2019) (citing Alan M. Wilner, *Blame It All on Nero: Code Creation and Revision in Maryland* (1994)). "Maryland Code Revision began in 1970 as a long-term project to create a modern comprehensive code when Governor Marvin Mandel appointed the Commission to Revise the Annotated Code. This formal revision of the statutory law for the General Assembly was coordinated by the Department of Legislative Services." *In re S.K.*, 466 Md. 31, 56 n.21 (2019). The process was completed in 2016 with the enactment of the Alcoholic Beverages Article. *Id.*

the business of insurance." Section 27-104 gives the Commissioner discretion to bring an enforcement action for an act or practice that is not specifically prohibited in Title 27 but the Commissioner nonetheless believes is "an unfair method of competition or an unfair or deceptive act or practice." The remaining subtitles of Title 27 contain specific acts and practices that are prohibited.

Featherfall relies on Title 27, Subtitle 3 ("Unfair Claim Settlement Practices") for its specific allegations of unfair acts and practices against Travelers. Ins. §§ 27-301–306. The subtitle "provide[s] an additional administrative remedy to a claimant for a violation of this subtitle or a regulation that relates to this subtitle." *Id.* § 27-301(a). Section 27-303 states that "[i]t is an unfair claim settlement practice and a violation of this subtitle for an insurer" to engage in an enumerated list of actions, including, as relevant here, "fail[ing] to provide promptly on request a reasonable explanation of the basis for a denial of a claim." *Id.* § 27-303(b). Section 27-304 expands the list of prohibited claim settlement practices to include those that are "committed with the frequency to indicate a general business practice," including, *inter alia*, "fail[ing] to acknowledge and act with reasonable promptness on communications about claims that arise under policies" and "refus[ing] to pay a claim without conducting a reasonable investigation based on all available information." *Id.* §§ 27-304(2), (4). Section 27-305 establishes penalties for violations of Subtitle 3 and its associated regulations.

Section 2-215 of the Insurance Article governs appeals, including those for orders originating from Title 27, Subtitle 3 complaints. *Id.* § 27-306. Appeals are allowed for orders resulting from a hearing, the Commissioner's refusal to grant a hearing, and

5

decisions issued by the Commissioner on the prioritization of complaints. *Id.* § 2-215(a).

Only the following persons have standing to appeal: parties to the hearing; "an aggrieved

person whose financial interests are directly affected by the order resulting from a hearing

or refusal to grant a hearing"; and a party to a decision about prioritization of complaints.

*Id.* § 2-215(b). On appeal, the reviewing court may:

> (1) affirm the decision of the Commissioner;
> (2) remand the case for further proceedings; or
> (3) reverse or modify the decision of the Commissioner if substantial rights of the petitioners may have been prejudiced because administrative findings, inferences, conclusions, or decisions:
> . . .
> (iv) are affected by other error of law;
> . . .
> (vi) are arbitrary or capricious.

*Id.* § 2-215(h).

### 2. *The Maryland Insurance Administration*

The General Assembly authorized Maryland's first executive agency for insurance

in 1872 when it created the Insurance Department under the Comptroller of the Treasury.

1872 Md. Laws ch. 388. The Department became an independent agency in 1878. 1878

Md. Laws ch. 106. In 1970, it became the Insurance Division of the Department of

Licensing and Regulation. 1970 Md. Laws ch. 402. Its modern iteration as MIA, an

independent agency, arose in 1993, 1993 Md. Laws ch. 538, and its enabling statute is

found in Title 2 of the Insurance Article. Ins. §§ 2-201–507. "The Administration licenses

and regulates insurers, insurance agents, and brokers who conduct business in the State,

and monitors the financial solvency of licensed insurers. The Administration is also

responsible for collecting taxes levied on all premiums collected by insurance companies

within Maryland." *Maryland Insurance Administration: Origins and Functions* (Jan. 11, 2024), https://msa.maryland.gov/msa/mdmanual/25ind/html/47insurf.html [https://perma.cc/NQ59-L5QG].

The Insurance Commissioner is the head of MIA. Ins. § 2-101(b). The Commissioner has the discretion to hold hearings "that the Commissioner considers necessary for any purpose" under the Insurance Article and is required to hold a hearing "if required by any provision of [the Insurance Article] . . . on written demand by a person aggrieved by any act of, threatened act of, or failure to act by the Commissioner or by any report, regulation, or order of the Commissioner" unless otherwise provided in the Article *Id.* § 2-210(a).

### B. History of the Claim and the Attempted Assignment

Travelers issued a homeowners insurance policy (the "Policy") to K.K. and G.K. (collectively, the "Insured") for their home in Potomac, Maryland. The Policy's coverage began on February 23, 2019, and continued for a one-year term. The Policy included property coverage for the dwelling, other structures on the property, personal property, and loss of use and liability coverage for personal liability and medical payments to others. The Policy also included the following provision regarding assignment:

> **5. Assignment.** Assignment of this policy will not be valid unless we [Travelers] give our written consent.

On May 20, 2020, the Insured notified Travelers of purported wind and hail damage to their home's roof that they believed occurred the year prior on June 2, 2019 (the "Claim"). Prior to filing the Claim with Travelers, also on May 20, 2020, the Insured hired

Featherfall to conduct the repairs on the roof. Travelers sent a claim representative to inspect and evaluate the damage to the roof on June 2, 2020. At the Insured's request, the Travelers representative arranged for a Featherfall representative to be present for the inspection as well. The Travelers representative identified signs of wear to the roof shingles but did not find damage from wind or hail on the roof or other exterior portions of the house. Based on these conclusions, Travelers denied the Claim because there was no damage covered by the Policy.

Travelers sent the Insured a letter notifying them of the denial and its bases on June 19, 2020. On the same day, Featherfall emailed the Travelers representative two documents: an "Assignment of Claim" between Featherfall and the Insured, dated May 20, 2020, and a letter from Featherfall's counsel containing his legal opinion that the assignment was enforceable although the Policy contained an anti-assignment provision. The substance of the "Assignment of Claim" contract between the Insured and Featherfall provides in full:

> **1.** I the undersigned Insured ("Assignor") hereby authorize Featherfall Restoration, LLC to perform services as set out in the separately executed Work Authorization Agreement at the property located at the above listed Loss Location address.

> **2. Assignment of Claim:** In consideration of work and services being rendered or to be rendered by Featherfall Restoration, LLC pursuant to the separately executed Work Authorization Agreement, as well as any change orders thereafter, I the undersigned Insured ("Assignor") hereby irrevocably transfer, assign, and set over onto Featherfall Restoration, LLC ("Assignee") any and all insurance rights, benefits, proceeds, and any causes of action under applicable insurance policies for the above mentioned claim. In this regard I waive my privacy rights.

8

I hereby unequivocally direct my insurance carrier to release any and all information requested by Featherfall Restoration, LLC, its representatives, and/or its attorney for the purpose of obtaining actual benefits to be paid by my insurance carrier for services rendered or to be rendered associated with the above mentioned claim.

**3. Direct Payment Authorization:** I hereby authorize and unequivocally direct payment of any claims benefits for services rendered or to be rendered by Featherfall Restoration, LLC to be made payable to Featherfall Restoration, LLC.

The letter from Featherfall's counsel explained his position that Maryland case law, including cases from before 1900, allow assignment of insurance claims after a loss occurs and that the Section 322 of the Restatement (Second) of Contracts (1981), which discusses anti-assignment claims, supports this interpretation. However, Featherfall's counsel noted that he had not read the language in the Policy.

Featherfall then attempted to discuss Travelers' denial of the Claim with the Travelers representative who had conducted the inspection of the roof. In two separate phone calls on June 25, 2020, the Travelers representative declined to discuss the denial with Featherfall because the Policy's anti-assignment clause invalidated any attempts by the Insured to assign the Claim to Featherfall without Travelers' written consent, which it had not given.

*C. Featherfall's Administrative Complaint*

Because of Travelers' position that the Insured's assignment of their claim was invalid and the resulting lack of communication about the Claim between Featherfall and Travelers, Featherfall filed an administrative complaint against Travelers with the MIA. The Insured were not party to the complaint. In its complaint letter, Featherfall asserted

that it had the same rights under the Policy as the Insured, including the right to discuss the Claim with Travelers and the right to receive the letter denying the Claim, and that such failure violated Section 27-303 of the Insurance Article of the Maryland Code.[4] Featherfall stated that it wanted Travelers to honor the assignment and made the same legal arguments regarding the enforceability of assignments it made in the letter to Travelers. Finally, Featherfall alleged that Travelers violated Section 27-102 of the Insurance Article, which contains a catch-all provision regarding unfair trade practices,[5] by failing to honor the Assignment of Claim contract.

In response, Travelers maintained its position that the anti-assignment clause in the Policy prohibited the assignment of the Claim to Featherfall and asserted that the anti-assignment clause was consistent with Maryland law. Travelers further averred that the Assignment of Claim did not give Featherfall the rights of a public adjuster, defined in Section 10-401(g)(1) of the Insurance Article as

> a person who for compensation . . . acts or aids, solely in relation to first-party claims arising under an insurance policy that insures the real or personal property of the insured, on behalf of the insured in negotiating for, or effecting the settlement of, a claim for loss or damage covered by an insurance policy . . . [or] investigates or adjusts losses, or advises an insured about first-party claims for losses or damages arising out of an insurance policy that insures real or personal property for another person engaged in

---

[4] Section 27-303 of the Insurance Article provides a list of practices that constitute unfair settlement practices for insurers, including "fail[ure] to provide promptly on request a reasonable explanation of the basis for a denial of a claim." Ins. § 27-303(6).

[5] Section 27-102 provides in full: "A person may not engage in the State in a trade practice that is defined in this title as, or determined under this title to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance." Ins. § 27-102.

the business of adjusting losses or damages covered by an insurance policy, for the insured.

On August 19, 2020, MIA issued a determination letter concluding that Travelers had not violated Maryland insurance laws and regulations. It specifically stated:

> In determining whether to pay a claim an insurer has an obligation to deal honestly and in good faith with its customers. An insurer is required to pay and adjust claims in accordance with its policy's provisions and applicable law. In the instant case, although you [Featherfall] may disagree with Travelers' handling of the claim, the company's position is supported by the results of its claim investigation and specific language from the insurance policy. Travelers' actions have not been shown to be arbitrary and capricious, lacking in good faith or to otherwise be in violation of the Insurance Article.

Featherfall timely requested a hearing on the determination in accordance with MIA's regulations, which was granted. In its request, Featherfall asserted that

> [t]he insurance administration has errored [sic] as a matter of law by allowing Travelers to use an anti-assignment clause to refuse to honor a post-loss assignment of an insurance claim. Maryland follows the Restatement Second of Contract -- the definitive work on contract law. Under the Restatement Second of Contracts, Travelers' anti-assignment clause cannot bar a policyholder from assigning his claim to a contractor like Featherfall. The MIA erred by refusing to follow the Restatement Second of Contracts and enforce the anti[-]assignment clause.

As a remedy, Featherfall asked MIA "to order Travelers to comply with its legal obligations under [the] Restatement Second of Contracts and honor Featherfall's assignment" and also "issue a decision condemning the business practice of improperly using anti-assignment clauses to refuse to honor valid assignments as illegal."

Before the hearing was held, both Featherfall and Travelers filed motions for summary decision, agreeing that there were no disputes of material fact. After the motions were fully briefed, MIA Insurance Commissioner Kathleen A. Birrane heard oral argument

11

on the cross motions on May 7, 2021. Travelers asserted that it was entitled to summary decision because it had fully complied with the requirements of Section 27-303. It argued that it provided the Insured with all the information required under the Insurance Article and MIA regulations and was only made aware of the Assignment of Claim after Travelers had sent the denial letter. Travelers also stated that it would honor a direction of payment, which it explained was a more limited assignment than the one made to Featherfall. For its part, Featherfall asserted that there are different types of assignments—assignments of policies, assignments of rights, and directions of payment—which grant the assignee differing rights. Featherfall argued that assignments of rights and directions of payment are both assignable after a loss has occurred. Finally, Featherfall averred that the Maryland General Assembly could ban assignments of claims but that it had not done so.

Commissioner Birrane ultimately granted Travelers' motion for summary decision, issuing a memorandum opinion and order on March 31, 2022. In the opinion, the Commissioner explained that although Travelers did "not expressly raise[] the issue of whether Featherfall was a person aggrieved by the MIA's determination" as required for requesting a hearing before the Commissioner, she found that "in the circumstances of this case, the question of standing [was] inextricably entwined with the positions taken by Travelers on the merits and, thus, must be addressed." She concluded that "Featherfall was not a claimant, derived no rights under the Policy by virtue of the Assignment, and was not aggrieved by the [MIA's] Determination" and therefore had no standing to request a hearing. The Commissioner explained that whether Featherfall was aggrieved depended upon whether the Assignment of Claim was valid; if it was valid, then Featherfall had rights

12

under the Policy and was an aggrieved person, but if the assignment was invalid, then Featherfall did not have rights and was not an aggrieved person. The Commissioner then concluded that, based upon the Maryland Supreme Court's rationale in *Dwayne Clay, M.D., P.C. v. Government Employees Insurance Co.*, 356 Md. 257 (1999), Travelers' anti-assignment clause also prohibited post-loss assignments and remained enforceable.

The Commissioner provided three explanations for why the Policy's anti-assignment clause was enforceable. First, she relied on *Clay* and *Michaelson v. Sokolove*, 169 Md. 529 (1936), for the proposition that the Supreme Court had enforced anti-assignment clauses despite attempted assignments post-loss. Second, the Commissioner discussed Maryland's precedent on choses in action[6] and concluded that Featherfall's position that the occurrence of a loss "converts the contractual right to payment under the policy into a chose [in] action" was too broad. She explained that the denial of an insurance claim may create a chose in action, but no such chose in action exists until the insurance company actually approves or denies a claim. Third, the Commissioner stated that "Maryland applies the objective theory of contract interpretation to insurance policies and enforce[s] that language . . . as long as it does not violate public policy." After concluding

---

[6] This Court has cited the Black's Law Dictionary (9th ed. 2009) definition of chose in action:

> 1) A proprietary right *in personam*, such as a debt owed by another person, a share in a joint-stock company, or a claim for damages in tort; 2) The right to bring an action to recover a debt, money, or thing; or 3) Personal property that one person owns but another person possesses, the owner being able to regain possession through a lawsuit.

*John. B. Parsons Home, LLC v. John B. Parsons Found.*, 217 Md. App. 39, 57 (2014).

13

that the Policy language was clear and contained an anti-assignment clause, she explained that the clause could only be unenforceable if it was contrary to public policy. She then heavily quoted from *Clay* regarding instances where provisions in contracts either were or were not found to be against public policy before determining that Featherfall had not identified any statement of public policy that prohibited the Policy's anti-assignment clause.

The Commissioner further stated that "[e]ven if there were a basis on which Featherfall could proceed, . . . Featherfall has not demonstrated that Travelers violated § 27-303 or § 27-304 by refusing to communicate with Featherfall regarding the Claim." The Commissioner explained that Travelers "responded promptly" to the Claim by evaluating the roof and sending a denial letter within a month of being notified of the Claim and before it was made aware of the Assignment. The Commissioner also noted that

> Featherfall confirmed that the roof has never been repaired and there is no evidence in the record that the Insured has ever questioned the denial or pushed for coverage or for repairs. The sole purpose of this proceeding by Featherfall relates to Travelers' refusal to recognize the Assignment. But, the refusal to recognize the Assignment does not fall within any of the unfair settlement practices defined in Subtitle 3 [of Title 27 of the Insurance Article], particularly given that Travelers was not even made aware of the Assignment until it had effectively discharged its obligations with respect to the Claim.

The Commissioner therefore granted Travelers' motion for summary decision, denied Featherfall's motion for summary decision, struck Featherfall's request for a hearing on MIA's denial of its complaint, and dismissed the case.

*D. Judicial Review in the Circuit Court for Baltimore City*

Featherfall filed a petition for judicial review of the Commissioner's order in the Circuit Court for Baltimore City on April 28, 2022.  In addition to judicial review, Featherfall requested that the circuit court "issue a declaratory judgment that the May 20, 2020 Assignment of Claim to [Featherfall] was valid, enforceable, conferred valuable property and contract rights to [Featherfall] and did not violate the [anti-assignment clause]."  MIA and Travelers both joined as interested parties.  The three parties again agreed that there were no disputes of material fact, and Featherfall requested summary decision.  After receiving briefs from the parties, the circuit court held oral argument on September 13, 2022.  Ultimately, the court affirmed the Commissioner's decision and denied Featherfall's request for declaratory judgment as inappropriate.

Featherfall timely appealed to this Court.

**PARTIES' CONTENTIONS**

*A. Validity of Post-Loss Assignment*

Featherfall presents three primary reasons as to why it believes that the Assignment of Claim was valid and enforceable.  First, it asserts that the Policy's anti-assignment clause only prohibits assignments of the entire Policy without Travelers' consent, not assignment of an individual claim under the Policy, as happened here.  Featherfall maintains that this is the plain reading of the anti-assignment clause, and if Travelers wanted to prohibit

assignments of claims, then such language should have been in the Policy.[7]  Second,

Featherfall cites a set of cases from the 19th century for its proposition that Maryland

allows post-loss assignment of insurance benefits even if the policy contains an anti-

assignment clause, because a post-loss assignment is the same as any other chose in action.

*Whiting v. Indep. Mut. Ins. Co.*, 15 Md. 297 (1860); *Consol. Real Est. & Fire Ins. Co. v.*

*Cashow*, 14 Md. 59 (1874); *Dickey v. Pocomoke City Nat'l Bank*, 89 Md. 280 (1899).

Featherfall distinguishes more recent Maryland cases on assignments by arguing that they

either did not decide the precise issue of post-loss assignment validity or did not deal with

post-loss assignments in property insurance.  *Michaelson*, 169 Md. 529; *Clay*, 356 Md.

257; *Della Ratta v. Larkin*, 382 Md. 553 (2004).  Third, Featherfall relies on Section 322

of the Restatement (Second) of Contracts as support for its assertion that post-loss

assignments of benefits are valid and survive anti-assignment clauses.  Featherfall also

claims that most states allow post-loss assignments of benefits and that Maryland's

differing stance on insurance policy interpretation does not also necessitate a different rule

from other states on post-loss assignments.

MIA points to more recent cases for its proposition that Maryland enforces anti-

assignment clauses in post-loss assignment of benefits contexts.  *Michaelson*, 169 Md. 529;

*Clay*, 356 Md. 257.  MIA's position is that the Maryland Supreme Court's decision in *Clay*

applies to this case because *Clay* held that the subject policy's anti-assignment clause

---

[7] In its reply brief, Featherfall clarified that its position is not that the Policy's anti-assignment clause is unenforceable but rather that the Assignment of Claim is outside its scope.

16

prohibited the assignment of uninsured motorist benefits. Although *Clay* did not specifically address the question of whether the anti-assignment clause prevented post-loss assignment of benefits, MIA maintains that the outcome in *Clay* would not have been different if the case had been decided on the validity of post-loss assignment of benefits. Further, MIA asserts that Featherfall's argument that assigning a claim is different than assigning a policy is unavailing in this instance because Featherfall's assignment went beyond merely assigning a claim. MIA argues that Featherfall treated the Assignment of Claim as an assignment of the Policy because it did not file its MIA complaint based upon Travelers' denial of the claim but on Travelers' lack of communication with Featherfall. MIA also highlights that, although the Maryland General Assembly has expressly prohibited anti-assignment clauses in some health insurance contexts, it has not done the same for property insurance. In contrast to Featherfall's argument regarding the Restatement (Second) of Contracts, MIA maintains that, even if the Restatement is applicable in Maryland, the facts at issue here are outside the scope of Section 322 because the Policy's anti-assignment clause prohibited, not just limited, the Insured's power to assign rights under the Policy.

Travelers argues that a plain reading of the anti-assignment clause shows that the clause invalidated the Insured's attempted Assignment of Claim because Travelers did not give written consent to the assignment. Travelers counters Featherfall's assertion that assigning a claim and assigning a policy are different by reasoning that such a reading of the anti-assignment clause would render it toothless because an insured could assign any rights under the policy so long as the assignment was not for the whole policy. As MIA

17

does, Travelers relies on Maryland cases that upheld the validity of anti-assignment clauses and states that this case must be decided based upon those cases, not ones from out-of-state. *Clay*, 356 Md. 257; *Michaelson*, 169 Md. 529; *Della Ratta*, 382 Md. 553. Travelers goes further and asserts that the early cases cited by Featherfall predate the modern statutory scheme for insurance and thus are not accurate recitations of current Maryland law. According to Travelers, if post-loss assignments of benefits were valid under the Maryland common law as Featherfall argues, then the General Assembly expressly requiring healthcare insurers to recognize post-loss assignments would be superfluous. Finally, Travelers asserts that Featherfall is attempting "an end-run around" public adjusters and the laws that regulate them. Travelers argues that Featherfall's position would allow any assignee to be the insured's advocate or otherwise settle their claims despite Maryland's strict regulation of who can advocate on behalf of customers in insurance disputes. Ins. §§ 10-401–416.

### B. Featherfall's Standing

Featherfall asserts that the parties never argued the issue of standing before the Commissioner and that the Commissioner therefore erred by "opin[ing]" that Featherfall was not a claimant and did not have standing. Featherfall further characterizes the Commissioner's reasoning as circular: because the Commissioner concluded that the Assignment of Claim was void, Featherfall does not have a financial interest and therefore does not have standing to contest that the Assignment of Claim was void. Regarding its allegation that Travelers uses unfair claim settlement practices, Featherfall contends that the Insurance Article does not limit who can bring a claim of an unfair practice and, because

18

Featherfall claims it was allowed to stand in the shoes of the Insured under the Assignment of Claim, Featherfall had standing to file a complaint about Travelers' practices.

MIA asserts that the Commissioner properly denied hearing rights to Featherfall. In contrast to Featherfall's argument that the Commissioner's decision was circular, MIA states that the question of whether Featherfall had hearing rights is "functionally identical" to the question of whether the Assignment of Claim was valid. MIA highlights that standing for requesting a hearing before the Commissioner is dictated by statute, which requires that a person be aggrieved by the Commissioner's acts or failures to act in order to request a hearing. Ins. § 2-210(a)(2). According to the MIA, if the Assignment of Claim was invalid, then Featherfall had no property rights affected by the MIA's initial denial letter that would make Featherfall an aggrieved person. Further, MIA points out that the Insurance Article only allows "claimants" to assert claims of unfair claim settlement practices. Ins. § 27-301(a).

For its part, Travelers largely echoes MIA's arguments regarding Featherfall's standing. Travelers adds that MIA regulations define "claimant" as either first-party or third-party claimants, of which Featherfall is neither. COMAR 31.15.07.02(B)(3). Travelers therefore asserts that Featherfall was neither a claimant entitled to pursue an unfair claim settlement practice claim against Travelers, nor was it aggrieved by MIA's denial because Featherfall did not have a property interest in the Claim.

### C. *Insurance Article Violations*

Featherfall maintains that because it believes its Assignment of Claim was valid, the Commissioner also erred as a matter of law by not considering whether Travelers violated

19

the Insurance Article. Featherfall alleges that Travelers violated Section 27-303(6) by failing to communicate with Featherfall about the denial of the claim. Further, Featherfall contends that the Commissioner abused her discretion by not considering whether Travelers' actions were pervasive and recurring and thus in violation of Section 27-304. Featherfall further argues that the Commissioner abused her discretion by failing to consider whether Travelers' actions violated the catch-all provision of Section 2-102 of the Insurance Article.

MIA argues that, even assuming Featherfall had standing to assert violations of Sections 27-303 and 27-304, Featherfall failed to demonstrate the existence of such violations. MIA avers that Featherfall has not disputed the Commissioner's findings of fact, which show that Travelers had communicated with Featherfall on various occasions, including at the visit to the Insured's home and through phone calls with Travelers' claim representative. Further, MIA points to a statement by Featherfall's counsel that what Featherfall wanted was to receive the Claim denial letter in the first instance, which MIA asserts is not a right under the Insurance Article. MIA and Travelers both argue that the Commissioner did not abuse her discretion in declining to consider whether Travelers' refusal to acknowledge the Assignment of Claim was an illegal practice not specifically enumerated in the Insurance Article.

Travelers asserts that the Commissioner was correct in concluding there was no violation of the Insurance Article and that her decision is entitled to deference. Travelers further avers that it acted reasonably in interpreting its Policy language and applicable law and thus cannot be found to have violated the Insurance Article.

**STANDARD OF REVIEW**

"When reviewing a decision of an administrative agency, [a reviewing court] looks through the decisions of the circuit court . . . and evaluates the decision of the agency." *Comptroller v. FC-GEN Operations Invs. LLC*, 482 Md. 343, 359 (2022).

In considering an agency's findings of fact, "a reviewing court applies the 'substantial evidence' standard, under which the court defers to the facts found and inferences drawn by the agency when the record supports those findings and inferences." *Md. Dep't of Env't v. Cnty. Comm'rs of Carroll Cnty.*, 465 Md. 169, 201 (2019) (citing *Md. Dep't of Env't v. Anacostia Riverkeeper*, 447 Md. 88, 120 (2016)). The reviewing court considers "'whether a reasoning mind reasonably could have reached the factual conclusion' reached by the agency." *FC-GEN*, 482 Md. at 359 (quoting *Frey v. Comptroller*, 422 Md. 111, 137 (2011)).

We review an agency's legal conclusions as a matter of law. *Id.* at 360. In doing so, we consider whether the agency decision includes an "error of law." *Id.* Potential errors of law include "(1) the constitutionality of an agency's decision; (2) whether the agency had jurisdiction to consider the matter; (3) whether the agency correctly interpreted and applied applicable case law; (4) and whether the agency correctly interpreted an applicable statute or regulation." *Id.* The first three categories of legal error do not receive any deference. *Id.* An agency's interpretation of a statute it administers, or regulations promulgated under such a statute, typically does receive a degree of deference. *Id.* at 362; *see also* Carly L. Hviding, Note, *What Deference Does It Make? Reviewing Agency Statutory Interpretation in Maryland*, 81 Md. L. Rev. Online 12, 14–15, 21–22 (2021)

21

(discussing the *Skidmore* deference standard as dependent on various factors including agency expertise and explaining that Maryland courts typically give particular consideration of an agency's expertise in reviewing agency decisions). The precise degree of deference given to an agency's interpretation differs, with more weight given "when the interpretation resulted from a process of 'reasoned elaboration' by the agency, when the agency has applied that interpretation consistently over time, or when the interpretation is the product of contested adversarial proceedings or formal rule making." *Cnty. Comm'rs of Carroll Cnty.*, 465 Md. at 203–04 (citing *Balt. Gas & Elec. Co. v. Pub. Serv. Comm'n*, 305 Md. 145, 161–62 (1986)).

A reviewing court applies an arbitrary and capricious standard of review to matters committed to agency discretion. *Id.* at 202. This standard is "extremely deferential" and "highly contextual," generally considering whether "the agency exercised its discretion 'unreasonably or without a rational basis.'" *Id.* (quoting *Harvey v. Marshall*, 389 Md. 243, 297 (2005)).

## DISCUSSION

### A. Validity of Post-Loss Assignment of Benefits

Generally, Maryland courts "interpret the language of an insurance policy with the same principles and rules of construction that we use to interpret other contracts." *Connors v. Gov't Employees Ins. Co.*, 442 Md. 466, 480 (2015). As such, an insurance policy is "measured by its terms unless a statute, a regulation, or public policy is violated thereby." *Pacific Indem. Co. v. Allstate Fire & Cas. Co.*, 302 Md. 383, 388 (1985). "We give the words of insurance contracts their customary, ordinary, and accepted meaning, as

22

determined by the fictional 'reasonably prudent lay person.'" *Connors*, 442 Md. at 480 (quoting *Beale v. Am. Nat'l Laws. Ins. Reciprocal*, 379 Md. 643, 660 (2004)). In *Cheney v. Bell National Life Insurance Co.*, the Supreme Court of Maryland explained that, unlike many other jurisdictions,

> Maryland does not follow the rule . . . that an insurance policy is to be construed most strongly against the insurer. Rather, following the rule applicable to the construction of contracts generally, we hold that the intention of the parties is to be ascertained if reasonably possible from the policy as a whole.

315 Md. 761, 766–67 (1989). To this end, "effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Sagner v. Glenangus Farms*, 234 Md. 156, 167 (1964).

### 1. Pre- and Post-Loss Assignments of Benefits

We begin by reviewing the Maryland cases cited by the parties for their opposing positions on whether an insurance claim or benefit can be assigned after a loss occurs.

The earliest case cited by the parties is *Whiting v. Independent Mutual Insurance Co.*, 15 Md. 297 (1860). There, Whiting obtained insurance coverage for his boat from three different insurance companies, each for approximately a third of the boat's value. *Id.* at 320 (Eccleston, J., concurring in part and dissenting in part). When the boat sustained damage, Whiting obtained the full amount of the damages from the first-obtained company and brought suit on that company's behalf against the remaining two companies for their respective thirds of the cost. *Id.* at 320–22. One of those companies, Independent Mutual

Insurance, alleged that it did not need to pay a portion of the cost because Whiting had already been paid in full for the damage. *Id.* at 322.

The Supreme Court addressed whether "any thing which has since occurred has operated to discharge [Independent Mutual] from liability on its contract." *Id.* at 313 (majority opinion). The Court concluded that, under the policy, as "soon as the loss occurred, the liability of [Independent Mutual] to pay its just proportion of that loss was fixed; it became a debt due to Whiting, which like any other *chose in action* might be sued for and recovered, or assigned." *Id.* The Court relied in part on an opinion from the Supreme Judicial Court of Massachusetts in which, "after deciding that the transfer of the title to property insured against fire, did not confer upon the assignee an[y] right to recover the insurance money," that Court stated:

> These considerations . . . do not apply to a case where the assured, after a loss, assigns his right to recover that loss; it would stand on the same footing as the assignment of a debt, or right to recover a sum of money actually due, which like the assignment of any other *chose in action*, would give the assignee an equitable interest, and a right to recover in the name of the assignor, subject to set-off and all other equities.

*Id.* (quoting *Wilson v. Hill*, 3 Met. 66, 69 (Mass. 1841)). Ultimately, the Supreme Court held that Independent Mutual owed a debt to Whiting because it had not yet paid its portion of the insurance proceeds and that Whiting had assigned that debt to the first-obtained company, which was entitled to bring suit against Independent Mutual to collect. *Id.* at 313–14.

In *Washington Fire Insurance Co. of Baltimore v. Kelly*, two insurance companies alleged that they were not responsible for the loss of the insured property after it was

24

destroyed by fire because the owners had contracted to sell the property. 32 Md. 421, 443 (1870). One policy prohibited transfer of the insured property without the company's consent, and both policies contained anti-assignment clauses. *Id.* at 434–35. The Washington Fire Insurance policy stated that "if this policy shall be assigned, without the consent of the company contained in writing thereon, then this policy shall be null and void" and

> [p]olicies of insurance subscribed by the company shall not be assignable without the consent of the company, expressed by endorsement made thereon; in case of assignment without such consent, whether of the whole policy or of any interest in it, the liability of the company, in virtue of such policy, shall thereafter cease.

*Id.*

The Atlantic Fire and Marine Insurance policy stated, "nor can any policy or interest therein be assigned but by the consent of the company, expressed by an endorsement made thereon." *Id.* at 435. The Court considered whether the contract to sell the insured property amounted to an assignment of the insurance policies for the property, summarizing the law of assignments as follows:

> Fire policies have never been regarded as transferable, without the consent of the company. Angell on Insurance, sec. 11. But where there is no restriction, the policy was assignable in equity, like any other *chose in action*; though to render the assignment of any value to the assignee, an interest in the subject-matter of the insurance must be assigned also, for the assignment only covers such interest as the insured had at the time of the assignment. This restriction applies only to transfers before a loss happens. 3 Kent's Comm., 496.
>
> The assignment after the loss, stands on the same footing as the assignment of a debt or right to receive a sum of money actually due. Angell on Insurance, sec. 222.

*Id.* at 437. The Court concluded that the contract for sale "did not amount to an assignment of the policy, or the assignment of any interest therein, and was simply a contract to assign; but the insured, in fact, held the policy and made no assignment thereof." *Id.*

In *Consolidated Real Estate and Fire Insurance Co. v. Cashow*, Newhall, Borie & Co. had insured its sugar refinery through the Fulton Company for $10,000, which then re-insured itself through Consolidated for $5,000. 41 Md. 59, 70 (1874). When the refinery was damaged in a fire, Consolidated contested that it was required to compensate for the loss, in part because Fulton had sold its claim for recovery from Consolidated to Cashow, allegedly in violation of the policy's anti-assignment clause. *Id.* at 70, 78–79. The Supreme Court explained that "[o]ne condition of the [re-insurance] policy is that if it shall be assigned without the consent of the company obtained in writing thereon, it shall be null and void. But this evidently refers to an assignment *before loss* . . . ." *Id.* at 78. The Court offered no explanation for this statement, nor did it provide the exact language of the condition. *Id.* The Court then considered whether the sale of the claim from Fulton to Cashow was valid under New York law, where the sale had occurred, and determined that the sale was valid and thus was an effective assignment of the post-loss claim despite the anti-assignment clause. *Id.* at 79–80.

In *Dickey v. Pocomoke City National Bank*, Charles R. Lewis used a mortgage note and insurance policies for a ship as collateral to obtain a loan from Pocomoke. 89 Md. 280, 290–91 (1899). When the ship was destroyed, Lewis requested that Pocomoke send him the insurance policies so he could collect the insurance money but promised to pay Pocomoke what was owed. *Id.* at 290. Various other creditors also sought the insurance

26

money, creating the issue of priority and requiring an evaluation of what interest in the insurance policy Pocomoke had obtained. *Id.* at 291–92, 298. The Supreme Court addressed whether Lewis's use of the insurance policy as a security constituted an assignment of the policy, concluding that:

> "Insurance policies may be pledged with or without written assignment." . . . The mortgage required the insurance to be taken and the policies were a part of the security given. It has been suggested that they prohibited assignments without consent of the companies. The companies might not have raised that objection to the validity of the policies, but if they had, it would have been no avail, as such provisions do not apply to pledges. So, up to the time of the fire the Pocomoke Bank held at least an equitable interest in the single bills, the mortgage and the insurances policies, and if there was any question about the right of Lewis to assign the policies before the fire, there can be none about such right after the fire took place. . . . They were then *choses in action* and an equitable assignment of them could be made by parol.

*Id.* at 298–99 (citations omitted). The Court thus held that Lewis had made a valid assignment of the insurance policies to Pocomoke. *Id.* at 299.

In *Michaelson v. Sokolove*, Mary Mervis Sokolove was the beneficiary of her late husband's life insurance policy, which contained the following provision: "Unless otherwise provided for herein, neither the supplementary contract nor any benefits accruing thereunder shall be transferable or subject to surrender, commutation, anticipation, or encumbrance, or in any way subject to the debts of any beneficiary or payee, or to legal process except as otherwise provided by law." 169 Md. 529, 530–31 (1936). Sokolove then assigned Michaelson "all her right, title and interest in and to the payments" under the policy as security for her purchase of stock. *Id.* at 531. Michaelson brought a suit in equity against Sokolove when she retained certain payments counter to the terms of the assignment. *Id.* at 532. In considering whether Sokolove's assignment to Michaelson was

valid, the Supreme Court said that the provision prohibiting assignment "could not properly be regarded as a restriction imposed simply for the insurer's benefit and convenience" and further stated that a "contract may validly provide that it shall not be assignable. In our opinion, the restrictions and purposes of the settlement prescribed in this case are valid and enforceable." *Id.* at 533–34 (citations omitted).

*Clay v. Government Employees Insurance Co.* considered "whether [an] application of [a] nonassignability clause is contrary to public policy." 356 Md. 257, 259 (1999). There, the insured was in a car accident and was treated by Clay. *Id.* In order to pay Clay, the insured executed an assignment of rights that entitled Clay to payment of her insurance money as needed to cover the medical expenses. *Id.* at 259–60. However, the insured's policy from GEICO included an anti-assignment clause stating, "Assignment of interest under this policy will not bind us without our consent." *Id.* at 260. After Clay was unable to obtain payment from the insured, Clay sought payment from GEICO under the policy's uninsured motorist benefits (which the insured had not pursued from GEICO herself), which refused to pay based upon the anti-assignment clause. *Id.* at 260–61. The Court differentiated *Clay* from *Hernandez v. Suburban Hospital Association*, 319 Md. 226 (1990), which had held that there was "good reason" to enforce certain health care assignments because they enabled patients to receive care even if they lacked the funds to pay upfront. *Clay*, 356 Md. at 268–69. However, unlike in *Clay*, there was no anti-assignment clause in *Hernandez*, leading the Court to conclude that the "reasons advanced by Clay are too nebulous to permit a judicial declaration that the [anti-assignment] clause is unenforceable on public policy grounds as applied here." *Id.* at 269–70.

28

From this review of the relevant cases, we first address the argument that there is a distinction between a pre-loss and a post-loss assignment. It is rightly uncontested by the parties that Maryland recognizes the validity of anti-assignment clauses in insurance policies. Although Maryland's early precedent seems to distinguish the effect of such clauses depending upon whether the assignment is pre- or post-loss, it is clear that our modern precedent does not make such a distinction. Both *Michaelson* and *Clay* considered a post-loss assignment of insurance claims, and in both cases, the Supreme Court found those assignments invalid because of an anti-assignment clause. *Michaelson* and *Clay* are the most recent cases to consider the issue of post-loss assignments of insurance benefits and as such are the precedent we apply in this case. We find no error in the Commissioner's reliance on these cases to reach her conclusion that the Policy's anti-assignment clause prohibited the attempted Assignment of Claim.

We also note that 19th century cases Featherfall relies upon predate the modern statutory and regulatory scheme for insurance. Insurance did not appear in its own article of the Maryland Code until 1922, 1922 Md. Laws ch. 492, and the *Whiting* and *Kelly* decisions both pre-date the creation of a state insurance agency. While these details are not dispositive, they strengthen our view that *Clay* is the modern precedent for insurance assignments.

We are further persuaded that this is the correct outcome in this case by MIA's and Travelers' arguments about other provisions of the Insurance Article that expressly require health insurers to recognize assignments. Section 14-205.3(b) provides that preferred provider organizations may not "prohibit the assignment of benefits to a provider who is a

29

physician by an insured," nor may such an organization "refuse to directly reimburse a nonpreferred provider who is a physician under an assignment of benefits."   Section 15-138(c)(1) requires most insurance carriers to "reimburse directly an ambulance service provider that obtains an assignment of benefits from an insured."  The General Assembly has not created a similar prohibition on anti-assignment clauses for property insurance companies, from which we can infer that the Legislature declined to create such a prohibition.[8]  *See, e.g.*, *WFS Fin., Inc. v. Mayor & City Council of Balt.*, 402 Md. 1, 14 (2007) ("If the Legislature intended payment of towing and storage fees to be a condition precedent to the release of the vehicle to the lienholder, the Legislature could have inserted such a requirement.  It chose not to do so."); *CX Reinsurance Co. v. Johnson*, 481 Md. 472, 502 (2022) ("If the General Assembly had intended to provide enforcement rights to tort claimants who have not obtained judgments or entered into approved settlements, it presumably would have drafted Maryland's direct action statute differently.").  Further, the General Assembly would not have needed to pass legislation requiring health insurance

---

[8] Additionally, at oral argument, Featherfall's counsel stated that Featherfall was hoping for a test case on post-loss assignments in property insurance but also conceded that this case's set of facts were not ideal.  She explained that a better scenario is one in which the insured needs urgent repairs on their home but is unable to pay a contractor upfront.  This scenario would put property insurance closer to the ambit of Sections 14-205.3(b) and 15-138(c)(1), which address concerns about health care providers not being paid because insurance carriers were not recognizing assignments obtained in order to treat patients who could not pay upfront.  *See* Md. Gen. Assembly Dep't Fiscal Servs., Revised Fiscal & Policy Note, S.B. 314, at 5 (May 6, 2010), *in* Bill File to S.B. 314, 2010 Leg., 427th Sess. (Md. 2010).  However, such a case is not present here: the Insured were able to continue living in their home despite the damage, and the record is unclear as to whether Featherfall has actually performed any work on the property as of the time of this appeal.

providers to recognize post-loss assignments if such assignments were already valid under the common law. *See Gleaton v. State*, 235 Md. 271, 277 (1964) ("Statutes in derogation of the common law are strictly construed, and it is not to be presumed that the legislature by creating statutory assaults intended to make any alteration in the common law other than what has been specified and plainly pronounced.").

Featherfall relies heavily on Section 322 of the Restatement (Second) of Contracts (1981)[9] for its position that post-loss assignments are valid despite anti-assignment clauses. While we think the Restatement serves as an interesting juxtaposition to Maryland law on assignments, it is not binding upon this Court or any other in Maryland. The Restatement (Second) of Contracts—and every other Restatement—is merely a secondary source providing a survey of trends in common law on a national scale. *See* Black's Law Dictionary (11th ed. 2019) (defining a Restatement as "[o]ne of several influential treatises published by the American Law Institute describing the law in a given area and guiding its development"). As Black's Law Dictionary states, "Although the Restatements are frequently cited in cases and commentary, a Restatement provision is not binding on a court unless it has been officially adopted as the law by that jurisdiction's highest court." *Id. See also Rowe v. Montgomery Ward & Co., Inc.*, 473 N.W.2d 268, 278 (Mich. 1991) ("While we acknowledge the Restatement as persuasive authority on the subject of contracts, this Court is not, nor is any other court, bound to follow any of the rules set out

---

[9] Section 322(2)(a) reads: "A contract term prohibiting assignment of rights under the contract, unless a different intention is manifested, . . . does not forbid assignment of a right to damages for breach of the whole contract or a right arising out of the assignor's due performance of his entire obligation."

in the Restatement. Moreover, even assuming . . . that our ruling is inconsistent with the Restatement, the writings of the American Law Institute do not control the rulings of this Court, nor is the contract law of this state necessarily written to be consistent with the Restatement.").

The Maryland Supreme Court has not expressly adopted Section 322 of the Restatement (Second). Featherfall points to *Public Service Commission v. Panda-Brandywine* as demonstrative of Maryland's adoption of Section 322. 375 Md. 185 (2003). However, *Panda-Brandywine*'s mention of Section 322 is a far cry from the clear language used in other Supreme Court cases adopting various provisions of Restatements.[10] *Compare id.* at 197 ("The basic rules [of assignments] are well-stated in the Restatement (Second) of Contracts §§ 317–323 (1981)."), *with Pavel Enters., Inc. v. A.S. Johnson Co., Inc.*, 342 Md. 143, 166 (1996) ("To resolve these confusions [about whether Maryland followed the original Restatement of Contracts or the (Second) for promissory estoppel] we now clarify that Maryland courts are to apply the test of the Restatement (Second) of Contracts § 90(1) (1979) . . . ."), *and Lamb v. Hopkins*, 303 Md. 236, 245 (1985) ("[W]e expressly adopt § 319 [of the Restatement (Second) of Torts] as the law of this State governing the duty of those in charge of persons having dangerous propensities."), *and Phipps v. Gen. Motors Corp.*, 278 Md. 337, 353 (1976) ("Therefore, we adopt the theory of strict liability as expressed in § 402 A of the Restatement (Second) of Torts."). *See also*

---

[10] Further, *Panda-Brandywine*'s discussion of the Restatement focused on Sections 317 and 318 of the Restatement (Second) of Contracts, which, according to the Court, were principles that already applied in Maryland. *Id.* at 197–98.

*Weems v. Nanticoke Homes, Inc.*, 37 Md. App. 544, 556 (1977) ("The Court of Appeals has recognized no such change in Maryland law [to accord with the Restatement (Second) of Contracts § 133], and we would hesitate to recommend it in this case."); *Allied Inv. Corp. v. Jasen*, 354 Md. 547, 362 (1999) ("We refuse, however, to extend the tort further, to cover completely intangible rights or as section 242(2) of the Restatement [(Second) of Torts] contemplates, to situations in which the relevant document itself has not been transferred."); *Kiriakos v. Phillips*, 448 Md. 440, 483 (2016) ("Although we need not adopt Section 19 [of the Restatement (Third) of Torts], we find it helpful to illustrate how the theory of negligent entrustment provides a foundation for recognizing the tort of social host liability in the present case.").

For similar reasons, we are unpersuaded by Featherfall's arguments that a purported majority of the states follow the Restatement approach to post-loss assignments. The out-of-state cases Featherfall directs us to offer interesting discussions of the common law in other jurisdictions. They are, however, not the law in Maryland; *Michaelson* and *Clay* are. As such, there was no legal error in the Commissioner's decision that the assignment was invalid under those cases.

### 2. *Distinction Between Assigning a Claim and Assigning a Policy*

We are also unpersuaded by Featherfall's arguments that the Assignment of Claim did not fall under the Policy's anti-assignment clause. Featherfall parses the language of the anti-assignment clause and of the Assignment of Claim to assert that assigning the Policy as a whole is prohibited without Travelers' consent but assigning a single claim under the Policy is not.

When interpreting a contract like the Policy at issue here, "Maryland courts subscribe to the objective theory of contract interpretation." *Credible Behav. Health, Inc. v. Johnson*, 466 Md. 380, 393 (2019). "Under this approach, the primary goal of contract interpretation is to ascertain the intent of the parties in entering the agreement and to interpret 'the contract in a manner consistent with [that] intent.'" *Id.* (quoting *Ocean Petroleum Co. v. Yanek*, 416 Md. 74, 88 (2010)). Consideration of the parties' intent "requires us to consider the plain language of the disputed contractual provisions 'in context, which includes not only the text of the entire contract but also the contract's character, purpose, and the facts and circumstances of the parties at the time of execution.'" *Id.* at 394 (quoting *Ocean Petroleum*, 416 Md. at 88) (internal quotations omitted).

We agree with Travelers that the Policy's anti-assignment clause should not be read to allow assignment of any rights under the Policy so long as it does not amount to an assignment of the entire Policy. As Travelers asserts, such a reading would allow insured parties to assign as many of their rights under the Policy as they desire so long as such assignment does not transfer the whole of the Policy, or would allow piecemeal assignment of the whole Policy, all without Travelers' consent. This outcome would make the anti-assignment clause meaningless. *See Orkin v. Jacobson*, 274 Md. 124, 130 (1975) (likening contract interpretation to statutory interpretation, including that a statute is to be read "so that no word, clause, sentence or phrase shall be rendered . . . meaningless").

Featherfall also runs afoul in its interpretation of the Assignment of Claim, which, despite its title, goes beyond the mere assignment of benefits under the claim. Section 2 of the Assignment of Claim reads, in part, "I the undersigned Insured . . . hereby irrevocably

transfer, assign, and set over onto Featherfall Restoration, LLC . . . *any and all insurance rights, benefits, proceeds, and any causes of action* under applicable insurance policies for the above mentioned claim." (Emphasis added.) Although the Assignment is qualified by the "above mentioned claim" language, thus limiting it to the roof damage at the heart of this action, the remainder of the Assignment goes beyond assigning Featherfall the right to the insurance proceeds.[11] It was therefore a broad assignment that needed Travelers' consent to be valid, which was not obtained.

### B. Standing under the Insurance Article

We next address the Commissioner's conclusion that Featherfall lacked standing to request a hearing before the Commissioner and to file complaints alleging violations of consumer protection provisions of the Insurance Article. Although we review agency conclusions of law such as this as a matter of law, because the Commissioner's decision was premised on an interpretation of a statute and regulations that MIA administers, the decision is entitled to a "degree of deference." *FC-GEN*, 482 Md. at 362.

"The requirements for administrative standing under Maryland law are not very strict[,]" unless there is "a statute or a reasonable regulation specifying criteria for administrative standing." *Sugarloaf Citizens' Ass'n v. Dep't of Env't*, 344 Md. 271, 286 (1996), *superseded by statute*, 2009 Md. Laws ch. 651 (H.B. 1569), *on other grounds, as*

---

[11] At oral argument, Travelers highlighted this distinction and asserted that Section 3 of the Assignment ("Direct Payment Authorization") was all that was necessary to entitle Featherfall to any insurance proceeds and would have likely been an assignment consented to by Travelers. Travelers' issue with the Assignment is what we discuss here: that the Assignment of Claim goes beyond the right to proceeds or payment.

*recognized in Patuxent Riverkeeper v. Dep't of Env't*, 422 Md. 294 (2011). Here, there are statutes and regulations that limit administrative standing before the MIA and Commissioner.

### 1. *Standing to Request a Hearing*

Section 2-210 of the Insurance Article governs the Commissioner's authority to hold a hearing. Section 2-210(a)(1) provides that "[t]he Commissioner may hold hearings that the Commissioner considers necessary for any purpose under this article," and Section 2-210(a)(2)(ii) requires that the Commissioner hold a hearing "on written demand by a person aggrieved by any act of, threatened act of, or failure to act by the Commissioner or by any report, regulation, or order of the Commissioner, except an order to hold a hearing or an order resulting from a hearing."

Section 2-210 does not provide its own definition of "aggrieved person." The Supreme Court has used common law principles to conclude that, for purposes of the Maryland Administrative Procedure Act, Md. Code (2014, 2021 Repl. Vol.), State Gov't §§ 10-101–305, an aggrieved party "ordinarily must have an interest 'such that he is personally and specifically affected in a way different from . . . the public generally.'" *Sugarloaf*, 344 Md. at 288 (quoting *Med. Waste Assocs., Inc. v. Md. Waste Coal., Inc.*, 327 Md. 596, 611 (1992)). As the Commissioner indicated in her order, MIA has previously interpreted Section 2-210(a)(ii)'s "aggrieved person" language as "a person whose personal, pecuniary, or property interests are adversely affected by the action or decision of the [MIA] as to which a hearing is sought." *Md. Ins. Admin. (Ex Rel. D.H. and J.H.) v. Lapkoff Enters., Inc.*, Case No. MIA-2021-01-016, at 9.

36

Featherfall sought a hearing after MIA determined that Travelers had not violated Maryland insurance law in largely refusing to communicate with Featherfall about the Claim based upon Travelers' refusal to recognize to Featherfall's purported assignment. In order for Featherfall to be an "aggrieved person" with the ability to request a hearing, Featherfall would have needed to have a "personal, pecuniary, or property interest" different from that of the general public that was affected by MIA's decision. As the Commissioner rightly concluded, the question of whether Featherfall had an adversely-affected interest different from the general public was intrinsically tied to the question of whether the Assignment of Claim was valid. If the assignment was void, then Featherfall did not have a unique interest supporting its ability to request a hearing before the Commissioner. Because we agree that the Assignment of Claim was void, we conclude that the Commissioner did not err as a matter of law in finding that Featherfall lacked standing to request a hearing.

## 2. Standing to Bring an Unfair Claim Settlement Practices Complaint

The relevant provisions of the unfair trade practices title of the Insurance Article do not contain express limitations on who can bring a complaint under the title. However, Section 27-301(a) states that "[t]he intent of this subtitle [on unfair claim settlement practices] is to provide an additional administrative remedy to a *claimant* for a violation of this subtitle or a regulation that relates to this subtitle." (Emphasis added.) "Claimant" is defined through regulation as "either a first-party claimant or a third-party claimant and may include, in a particular case, the claimant's designated legal representative or a member of the claimant's immediate family designated by the claimant." Md. Code Regs.

31.15.07.02B(3). "First-party claimant" is further defined as "any person asserting a right to payment under an insurance policy pursuant to which the person is insured, which right arises out of the occurrence of a contingency or loss covered by the policy," and "third-party claimant" is further defined as "any person asserting a claim against a person insured under an insurance policy." *Id.* 31.15.07.02B(4), (11).

It is clear that Featherfall does not meet MIA's definitions of a claimant. Although Featherfall purports to be asserting a right to payment under an insurance policy, it is not asserting a right to payment under a policy that Featherfall is itself insured under and thus is not a first-party claimant. Nor is Featherfall asserting a claim against the Insured, such that it would be a third-party claimant. In the absence of meeting either of these definitions, Featherfall is not a party that the unfair claim settlement practices subtitle intends to offer a remedy to.

Featherfall argues that the Commissioner's discussion about standing is circular and prevents any party from challenging a determination that their assignment is void. We agree that the discussion was circular, insofar as the issue of standing is tied to the issue of assignment validity. However, the existence of the present case moots Featherfall's own argument. MIA cannot determine whether a party has standing unless and until it has considered whether a purported assignment is valid. If the party is found to lack standing based upon the absence of valid assignment, the party can then challenge the standing determination, which would allow it to also challenge the finding on the assignment.

## C. Insurance Article Violations[12]

Featherfall also challenges the Commissioner's findings that Travelers did not violate any portion of the Insurance Article. Whether Travelers violated Section 27-303 or 27-304 is a legal conclusion because prohibited actions are specified in statute, but "we may apply a degree of deference" to the Commissioner's decision because MIA administers those sections. *FC-GEN*, 482 Md. at 362. Whether Travelers violated the Section 27-102 catch-all language is a matter committed to the agency's discretion which we review under an arbitrary and capricious standard. Ins. § 27-102; *Cnty. Comm'rs of Carroll Cnty.*, 465 Md. at 202.

### 1. Section 27-303: Discrete Unfair Claim Settlement Actions

Featherfall alleged that Travelers violated Section 27-303(6)'s provision prohibiting insurance companies from "fail[ing] to provide promptly on request a reasonable explanation of the basis for a denial of a claim." Especially given that we owe a degree of deference to the Commissioner's decision on this issue, we do not find any error in the Commissioner's conclusion that Travelers did not violate this provision. The record clearly establishes that Travelers sent the Insured a letter explaining that their Claim was being denied because the damage to their roof was not covered under the Policy. Travelers sent this letter on June 19, 2020, 30 days after Travelers first learned of the damage (May 20,

---

[12] Although we agree with the Commissioner that Featherfall lacked standing, like the Commissioner, we address Featherfall's claims regarding alleged violations of the Insurance Article.

2020) and 17 days after Travelers' representative inspected the damage (June 2, 2020).[13] Like the Commissioner, we cannot conclude that this was an unreasonable time period for Travelers to provide an explanation for denial. There is also no indication in the record that the Insured requested an explanation of the denial, yet Travelers included one anyway.

## 2. *Section 27-304: Unfair Claim Settlement Business Practices*

Featherfall also alleged that Travelers' failure to communicate with Featherfall violated Sections 27-304(2) and (4), which prohibit insurers from "fail[ing] to acknowledge and act with reasonable promptness in communications about claims that arise under policies" and "refus[ing] to pay a claim without conducting a reasonable investigation based on all available information," when such actions are "committed with the frequency to indicate a general business practice." With respect to these claims, the Commissioner concluded that there was no evidence that Travelers had either failed to act promptly in communicating or refused to pay without reasonable investigation, nor was there evidence that any such failures occurred with such frequency as to constitute a "general business practice."

We also find no error in the Commissioner's conclusion that there was no violation of Section 27-304. The Commissioner's decision is due a degree of deference, but even absent that deference, we would find no error. Travelers responded to the Insured's communications about the Claim with reasonable promptness and conducted a reasonable

---

[13] The number of recognized business days between each event are even shorter: 21 days between notification of damage and issuance of denial letter, and 13 days between the inspection and the letter.

investigation of the Claim. Although Featherfall takes issue with the scope of the communication, Travelers did communicate with Featherfall about why it was refusing to discuss the Claim with Featherfall. Further, Featherfall did not present any evidence that Travelers either fails to respond to communications about claims or refuses to pay claims without reasonable investigation with such "frequency to indicate a general business practice." Featherfall only presented evidence related to its allegations about its own interactions with Travelers. Even if Travelers failed to respond promptly to Featherfall or failed to pay the Claim without investigation, this singular instance cannot meet the requirements of Section 27-304.

### 3. *Section 27-102 Catch-All*

Featherfall argued in its MIA complaint that "Travelers' larger policy of illegally refusing to honor assignments is not specifically outlawed but falls within the catch-all provisions of the [unfair trade practices] statute." Whether a non-specified practice is an unfair method of competition is squarely within the Commissioner's discretion. Section 27-104(a), which contains the procedures for determining illegal trade practices not enumerated in statute, is only triggered

> *[i]f the Commissioner believes* that a person engaged in the insurance business is engaging in the State in a method of competition or in an act or practice in the conduct of insurance business that, although not defined in this title, is an unfair method of competition or an unfair or deceptive act or practice . . . .

(Emphasis added.)

The Commissioner's decision to not invoke Sections 27-102 and 27-104 was not arbitrary and capricious. It was within the Commissioner's discretion to decline

41

Featherfall's request for a finding that Travelers' refusal to recognize the Assignment of Claim as a non-enumerated prohibited practice. Further, because the Commissioner was correct in determining that the Policy's anti-assignment clause rendered the Assignment of Claim void, the Commissioner's refusal to find Travelers' conduct illegal cannot be arbitrary or capricious.

## CONCLUSION

We conclude that the Commissioner did not err in concluding that the attempted Assignment of Claim between the Insured and Featherfall was void pursuant to the Policy's anti-assignment clause. In doing so, we clarify that Maryland enforces anti-assignment clauses and that such clauses prohibit assignments regardless of whether they were made before or after a loss under an insurance policy. We further conclude that the Commissioner did not err in finding that, because the purported assignment was void, Featherfall lacked standing to request a hearing before the Commissioner and to make a claim against Travelers for alleged unfair business practices. Finally, we find no error in the Commissioner's decision that Travelers did not violate Title 27 of the Insurance Article. For the above reasons, we affirm the judgment of the circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

42